**SOUTHWESTERN SHEET METAL WORKS, INC., Plaintiff-Appellee,**

v.

**SEMCO MFG., INC., Defendant-Appellant.**

**No. 85–1001.**

United States Court of Appeals, Fifth Circuit.

May 5, 1986.

Scott, Hulse, Marshall, Feuille, Finger & Thurmond, James T. McNutt, Jr., El Paso, Tex., William L. Keller, William B. West, III, Dallas, Tex., for defendant-appellant.

Robin P. Hartmann, Noel M. Hensley, Dallas, Tex., Gerald B. Shifrin, El Paso, Tex., for plaintiff-appellee.

Before GEE and GARWOOD, Circuit Judges, and BOYLE, District Judge *.

GEE, Circuit Judge:

This is an antitrust case involving one firm's claim that a new-entrant competitor and a union's business manager combined or conspired to restrain competition in violation of Sherman § 1.[1] Defendant Semco Mfg., Inc. ("Semco") appeals from a final judgment entered for plaintiff-appellee Southwestern Sheet Metal Works, Inc. ("Southwestern"). We reverse.

## I.

Southwestern and Semco both manufacture spiral pipe and fittings used in air conditioning duct systems. Before and during 1981, Southwestern had a manufacturing facility in El Paso, Texas. In 1980, Semco, which had plants in Missouri and Virginia, was considering the El Paso area as a site for a new plant. To that end, Semco's president and Henry Mesa ("Mesa")[2] negotiated a pre-hire union agreement in October 1980. The relevant provisions of that agreement granted Semco more favorable worker ratios than competitors in the El Paso area enjoyed. Specifically, on products receiving union labels other firms had to employ 3 journeymen, 1 apprentice, and no production workers. Under the terms of the October 1980 agreement, Semco could have 3 journeymen, 1 apprentice, and 3 production workers. Because production worker wages were less than those of journeymen and apprentices, this had the effect of reducing Semco's average composite wage rate for products it sold in competition with Southwestern.

Southwestern learned the terms of the October 1980 agreement in mid-May 1981. Southwestern's contract with the Union expired on June 30, 1981 and, having learned the terms of the Semco agreement, Southwestern demanded parity in any new agreement. Briggs, who replaced Mesa after Local 188 merged with Local 49 in April 1981, refused to give parity by extending the Semco terms to Southwestern, but tried to give Southwestern parity by cancelling the Semco agreement. Claiming that it was threatened with having the Union pull out if it did not concede before its contract expired, Southwestern signed a standard form agreement under protest. The disparity in employment and wage requirements was later resolved when Semco and the Union signed a revised contract.

In its complaint, Southwestern alleged that Semco and Mesa conspired to give Semco labor terms that would put Semco at a bidding advantage over its competitors. The alleged fact of injury included profits from the projects Southwestern lost because Semco underbid it. Southwestern calculated the amount of damages using time-series data in an econometric model that predicted the effect on its profits of a disparity in wage rate. The jury relied on this estimation procedure to find actual damages of $205,952.

On appeal, Semco contends that the trial court erred (1) in submitting the antitrust conspiracy issue to the jury; (2) in denying Semco's motion for a directed verdict based on Southwestern's alleged failure to prove the fact of damage; (3) in refusing to submit the labor exemption issue to the jury; (4) in submitting the damage issue to the jury; and (5) in admitting evidence that the Union tried and convicted Mesa of embezzlement and improper conduct. Because the fact of damage issue is dispositive here, we limit our review to it.

## II.

Semco contends that the district court erred in refusing to grant its motion for a

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. 15 U.S.C. § 1.

2. At that time, Mesa, a co-defendant in this action, was the business manager for Local 188 of the Sheet Metal Workers' International Association. In April 1981, Local 188 merged into Local 49 from Albuquerque. After the merger, Mesa was charged with mishandling Union funds and impropriety in connection with the Semco agreement. After a hearing before the executive board of Local 49, Mesa was expelled from the Union. Mesa is not before the Court in today's appeal.

directed verdict based on Southwestern's alleged failure to establish fact of injury. As we held in *M.C. Manufacturing Co., Inc. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1063–64 (5th Cir.1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976), to obtain damages for an antitrust violation, a plaintiff must establish, among other things, the fact of injury: that is, the plaintiff must "establish that such violation proximately caused injury to his business...." The standard of review controlling our analysis here is whether, viewing the evidence in the most favorable light and with all reasonable inferences drawn most favorably to it, Southwestern produced substantial evidence of injury caused by the alleged violation so that "reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions...." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc).

The fact of injury Southwestern claims to have established includes the foregone profits from bids it lost to Semco because Semco used a lower composite wage in determining its bids and, on bids Southwestern did win, the lower profits it realized due to the lower markup it could use when competing with Semco. Southwestern attempted to prove the fact of damage primarily through the testimony of an expert economic witness; other evidence came from a former Semco employee, the business manager for Local 49, Southwestern officers, and Southwestern sales slips and records.

Southwestern's expert economist, Roth, undertook a two-part analysis in his fact-of-injury inquiry. As a first step, he developed a model explaining variation in Semco's bid price for, among other periods, October 1980 through August 1981. The independent variables in the model, those hypothesized to explain variation in bids, were the average composite wage, the materials used, and total construction activity. The observations were all Semco bids from its Sunland Park, New Mexico, facility for the period January 1981 through August 1981. From this analysis, Roth determined that his model explained 89.47 percent of all variation in Semco bids. Moreover, Roth determined that the probability that the relationship between the composite wage rate and bids was random was less than 20 percent. Based on these results, Roth failed to reject his hypothesis that there was a systematic relationship between average composite wage and Semco bids. The second step in Roth's analysis involved comparing the bids Semco would have placed had it not had the wage advantage with bids Southwestern placed. To do this, Roth had to estimate the bid Semco would have placed but for the lower wage. He did this by multiplying Semco's actual bid by the product of the elasticity coefficient on the average composite wage variable he had estimated in the first-step model and the percentage difference between Semco's and Southwestern's average composite wage rate. He then compared the estimated Semco bids with corresponding Southwestern bids. Whereas with the wage advantage Semco almost uniformly had a lower bid than Southwestern, without the wage advantage Semco would have placed some bids that would have been higher than Southwestern's. From this, Roth concluded that Semco's comparative advantage derived from the lower wage affected the competitive environment in the industry and, because it was a competitor, affected Southwestern as well. Absent the wage advantage, Southwestern would have competed more successfully in bidding for projects.

With respect to this economic analysis, Semco argues that, regardless of what Roth may have accomplished, he did not present sufficient evidence of fact of injury. Even if the adjusted Semco bid would have exceeded Southwestern's bid, Roth could not conclude that Southwestern would have received the bid. Besides being less than persuaded by the statistical significance of Roth's estimation results, we agree with Semco's argument. We find nothing in the record to indicate that of all bids submitted, Southwestern would have won the bid but for Semco's wage advan-

tage. Southwestern's proof completely ignores *all other bidders.*

The other evidence that Southwestern points to as establishing the fact of injury likewise falls short. Donald Linss, a Semco budget analyst and controller during the relevant period, testified that Semco relied on the favorable wage rate in calculating bids from the Sunland, New Mexico facility. Semco points out, however, that Linss also testified that Semco did not use production workers in manufacturing spiral duct and fittings and that the favorable wage was therefore not a component in bids on these products. Southwestern next contends that Gary Briggs, the business manager for Local 49, testified about the chaos the Semco agreement was creating in the industry. The record shows that, although Briggs did refer to industry chaos, this had nothing to do with bidding. Instead, the chaos referred to resulted from other firms increasingly demanding the same labor terms from the Union as Semco had gotten. Southwestern finally argues that its officers, Charles Cooper and Jay Washbourne, testified that, during the period when Semco had the wage advantage, Southwestern was not a competitive bidder. We find nothing in Cooper's testimony to support a finding of fact of injury. Nor does Washbourne's testimony reveal that Southwestern lost or was likely to have lost any specific bids to Semco. Washbourne's testimony suggests only that Semco and Southwestern bid on some of the same projects during the relevant period, some of which Semco won and other of which Southwestern or a third party won; that Southwestern's bids during this period were 10 to 15 percent higher than some winning bids, a situation that changed after Semco lost its wage advantage; and that, by Washbourne's calculations, Semco had to have a wage advantage in its bids if it were to make any profits on the bids it was submitting.

At most, Southwestern's evidence of fact of injury suggests that something happened to Southwestern's profitability during 1981, that Semco was a competitor, and that Semco had an advantageous labor agreement. Not one instance is presented where, but for Semco's wage advantage, Southwestern would have won or was likely to have won. Nor is there evidence that Semco's wage advantage exerted such an influence on other competitors' bidding that Southwestern had reduced profits. Southwestern did not present sufficient evidence to lead reasonable and fair-minded jurors to reach different conclusions; its evidence calls for speculation. The district court therefore erred in denying Semco's motion for a directed verdict.

### III.

The district court order granting judgment to Southwestern is REVERSED. This cause is REMANDED with instructions to enter an order of judgment for Semco.