GREATER ROCKFORD ENERGY AND TECHNOLOGY CORP., Shepherd Oil, Inc., Vidalia Ethanol, Ltd., et al., Plaintiffs–Appellants,

v.

SHELL OIL COMPANY, Marathon Petroleum Company, Amoco Oil Company, Inc., Chevron, U.S.A., Inc., Atlantic Richfield Co., B.P. America, Exxon Company, U.S.A. and Mobil Oil Corporation, Defendants–Appellees.

No. 92–2212.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1992.

Decided June 15, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 2, 1993.*

---

* Circuit Judges Walter J. Cummings and John L. Coffey did not participate in the consideration of this petition for rehearing.

Gregg R. Potvin, Taylor, Thiemann & Aitken, Washington, DC, Bob F. Wright, Domengeaux & Wright, Lafayette, LA, Lloyd W. Gathings, Gathings & Davis, Birmingham, AL, Wayne M. Liao, Spiegel, Liao & Kagay, San Francisco, CA, Phil C. Neal (argued), George M. Hoffman, Neal, Gerber & Eisenberg, Chicago, IL, and Leslie J. Schiff, Sandoz, Sandoz & Schiff, Opelousas, LA, for plaintiffs-appellants.

Neil F. Hartigan, Atty. Gen., Bart T. Murphy, John W. McCaffrey, Asst. Attys. Gen., Office of the Atty. Gen.; and Robert E. Davy, Jr., Lison & Pullman, Chicago, IL, for plaintiff, People of State of Ill.

Peter M. Sfikas, Peterson & Ross, Chicago, IL, Ann Spiegel, A.M. Minotti, Shell Oil

Co. Legal Dept., Houston, TX; Ronald W. Teeple, John L. Leonard, Samuel Gideon Kramer, John William Loseman, Defrees & Fiske; Thomas A. Gottschalk, J. Andrew Langan, David A. Rammelt, Kirkland & Ellis, Chicago, IL; John H. Stroh, Marathon Oil Co.; Dan D. Sandman, Findlay, OH; Amy J. Berenson, Kirkland & Ellis, Washington, DC; Michael E. Rigney, Chicago, IL; Robert E. Gillespie, Hinshaw & Culbertson, Springfield, IL; Martin J. Keating; James J. Neath, Amoco Corp., Chicago, IL; John H. Long, Long, Morris, Myers & Rabin, Springfield, IL; John E. Bailey, Keith E. Parks, Mark A. Cervenka, David L. Ream, John T. Lewis, Chevron Corp., Houston, TX; Donald A. Bright, Atlantic Richfield Co., Los Angeles, CA; Philip H. Curtis (argued), Robert C. Mason, Arnold & Porter, New York City; Joseph Dattilo, Cleveland, OH; Robert G. Abrams (argued), Joanne E. Caruso, Howrey & Simon, Washington, DC; Jeffrey M. Cross, Patrick J. Ahern, Mary Clare Bonaccorsi, Ross & Hardies, Chicago, IL; Edward H. Beck, Mobil Oil Corp., Fairfax, VA; and R. Gerald Barris, Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., Springfield, IL, for defendants-appellees.

Before CUDAHY and RIPPLE, Circuit Judges, and LAY, Senior Circuit Judge.[**]

CUDAHY, Circuit Judge.

Ethanol producers and gasohol blenders sued a number of oil companies for treble damages and injunctive relief pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1988), alleging that the companies violated, *inter alia*, the Gasohol Competition Act of 1980, 15 U.S.C. § 26a (1988). The district court granted summary judgment against the plaintiffs on the ground that they lacked antitrust standing. Because we find that the plaintiffs have failed to show antitrust injury, we affirm.

## I.

Ethanol is an alcohol produced from the fermentation of grain, molasses and other agricultural products. When blended with gasoline (generally in a ratio of one part ethanol to nine parts gasoline), the motor fuel gasohol is formed. The plaintiffs, eleven ethanol manufacturers and/or sellers[1] and two gasohol blenders[2] (collectively, the plaintiffs), brought this action against eight integrated oil companies for treble damages and injunctive relief under §§ 4 and 16 of the Clayton Act.[3] They alleged violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1988), § 26a of the Clayton Act, otherwise known as the Gasohol Competition Act of 1980, 15 U.S.C. § 26a (1988), the Illinois Antitrust Law, 740 ILCS 10/1 *et seq.* (1992) (Ill.Rev.Stat. ch. 38 ¶ 60–1 *et seq.* (1991)), and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (1992) (Ill.Rev.Stat. ch. 121½ ¶ 261, *et seq.* (1991)). The plaintiffs assert that the defendants, individually and in combination, discriminated against and disparaged ethanol and gasohol to eliminate competition in the motor fuel market. In particular, the plaintiffs allege that the oil companies restricted the purchase and sale of gasohol by their dealers and jobbers, limited the use of their credit instruments in transactions involving gasohol, engaged in an anti-alcohol campaign by labeling their gasoline with signs indicating that the product contains "no alcohol" and, finally, communicated among themselves sensitive competitive information regarding ethanol and gasohol.

The district court held that the plaintiffs did not have standing to sue under § 4 and granted summary judgment for the defendants. 790 F.Supp. 804 (C.D.Ill.1992). The court applied the factors discussed in *Associ-*

---

[**] The Honorable Donald P. Lay of the United States Court of Appeals for the Eighth Circuit is sitting by designation.

[1]. Namely, Greater Rockford Energy and Technology Corporation, Shepherd Oil, Inc., Vidalia Ethanol, Ltd., Alpebo, Inc., Shreveport Ethanol, Inc., Lakefield Ethanol, Inc., A.E. Montana, Inc., CEPO, Inc., High Plains Corp. and Texas Ethanol Producers. Wurster Oil Company is a gaso-

hol blender, but has sued in its capacity as an ethanol seller.

[2]. Cajun Energy, Inc. and Public Terminals, Inc.

[3]. The State of Illinois intervened as a plaintiff before the district court, but its claims were dismissed without prejudice. The dismissal is not challenged in this appeal.

*ated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537–45, 103 S.Ct. 897, 908–12, 74 L.Ed.2d 723 (1983), and found that the injuries which the plaintiffs alleged, namely, lost profits resulting in the plaintiffs' business failures,[4] were indirect, derivative, speculative and duplicative given that the plaintiffs were not competitors or consumers in the market allegedly restrained and that there was an abundance of other causes for the plaintiffs' economic troubles.[5]

## II.

Summary judgment is warranted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). To forestall a motion for summary judgment, a non-movant plaintiff must present sufficient evidence to show the existence of each element of its case on which it will bear the burden of proof at trial. *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 48–49 (7th Cir.1992). Of course, we review the grant of summary judgment *de novo*, evaluating the evidence in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. We can affirm the grant of summary judgment on any ground, even one not relied on by the district court, if the record fairly supports that justification and it has not been waived by the appellee. *Martinez v. United Auto., etc., Local 1373*, 772 F.2d 348, 353 (7th Cir.1985).

Section 4 of the Clayton Act provides

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the dam-

ages by him sustained, and the cost of the suit, including a reasonable attorney's fee.

Although the language of this provision could be read to provide a treble-damage remedy to anyone who was injured in some way by an antitrust violation, the provision has not been construed so expansively. *Associated General Contractors*, 459 U.S. at 535, 103 S.Ct. at 907 (" 'It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.' " (quoting *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476–77, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982))). Given the potential scope of antitrust violations and the availability of treble damages, an over-broad reading of § 4 could result in "overdeterrence," imposing ruinous costs on antitrust defendants, severely burdening the judicial system and possibly chilling economically efficient competitive behavior. *See Matsushita*, 475 U.S. at 594, 106 S.Ct. at 1360; William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L.Rev. 1445, 1453 (1985). Accordingly, the Supreme Court has placed several limitations on the scope of antitrust liability. In *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, the Court held that § 4 plaintiffs must prove "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." 429 U.S. 477, 487–88, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). And in *Associated General Contractors*, it applied traditional common-law tort principles to read a proximate cause element into § 4 actions. Thus, the Court held that a plaintiff does not have standing to sue under § 4 if its injuries were indirect and speculative.[6]

A great deal of confusion has surrounded these two limitations. *See Local Beauty*

---

4. All of the plaintiffs, with the exception of High Plains Corp., have since gone out of business.

5. Having dismissed the federal claims for lack of antitrust standing, the district court dismissed the pendent claims under Illinois law for lack of jurisdiction. By failing to challenge the dismissal, the plaintiffs effectively concede that if summary judgment on the federal claims was appro-

priate, the dismissal of the pendent state claims was also appropriate.

6. The standing requirement similarly has been applied to treble-damage actions under RICO. *See, e.g., Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Illinois v. Life of Mid–America Ins. Co.*, 805 F.2d 763 (7th Cir.1986).

*Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1201 (7th Cir.1986) (noting confusion between antitrust injury and antitrust standing doctrines, and citing cases); Phillip Areeda & Herbert Hovencamp, Antitrust Law ¶ 334.3 (Supp.1991). Lack of standing and antitrust injury often have been invoked interchangeably against a plaintiff even though each concept involves a distinct element of the § 4 action. The elements of the § 4 action correspond to the components of a common-law action in tort. *See Associated General Contractors*, 459 U.S. at 533, 103 S.Ct. at 906 ("Congress simply assumed that antitrust damages litigation would be subject to constraints comparable to well-accepted common-law rules applied to comparable litigation."). An action in tort has four elements: (1) a duty recognized by law requiring the defendant to conform to a standard of conduct; (2) a breach of the duty; (3) damage or injury to a legally recognized interest; and (4) causation, including both causation in fact, or "but for" cause, and legal, or proximate cause. *See* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 30, at 164–65 (5th ed. 1984) [hereinafter Prosser & Keeton]. Correspondingly, the elements a plaintiff must satisfy to bring a § 4 action for treble damages are: (1) a duty recognized by the antitrust laws; (2) a violation of the antitrust laws; (3) injury to an interest protected by the antitrust laws and attributable to the antitrust violation—that is, *antitrust injury*; and (4) a direct link between the antitrust violation and the antitrust injury, that is to say, *standing*.[7]

■ Both antitrust injury and standing are, of course, necessary to proceed under § 4. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 nn. 5 & 6, 107 S.Ct. 484, 489 nn. 5 & 6, 93 L.Ed.2d 427 (1986);

*Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1377 (7th Cir.1987). Antitrust injury involves a causation requirement in order to define the class of potential plaintiffs eligible to bring suit—those "injured ... by anything forbidden in the antitrust laws." *See In re Indus. Gas Antitrust Litig.*, 681 F.2d at 516; Page, *supra*, at 1484. In establishing antitrust injury, courts must first delineate the *type* of interests protected by the antitrust laws, *see Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1419 (7th Cir.1989); *Local Beauty Supply*, 787 F.2d at 1202, and second, must determine whether the violation was the cause-in-fact of the injury: that "but for" the violation, the injury would not have occurred, *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1161 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *In re Indus. Gas Antitrust Litig.*, 681 F.2d at 515; Page, *supra* at 1462–63.

■ Standing, on the other hand, examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction. *See Cargill*, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6; *In re Indus. Gas Antitrust Litig.*, 681 F.2d at 516, 519; Page, *supra*, at 1484. Antitrust standing, however, is primarily a matter of legal policy, namely: "[W]hether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." Prosser & Keeton, *supra*, § 42, at 273; *cf.* Daniel Berger & Roger Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809 (1977) (proposing policy-

---

7. "Standing" may be broadly construed to involve all the elements of the cause of action. That is, a plaintiff may not have "standing" unless he can satisfy each requirement of the § 4 action—antitrust violation, antitrust injury and proximate cause. There is some logic to this interpretation, for as we shall discuss, *infra*, "standing" limits access to the cause of action to those properly suited to vindicate the violation. A person cannot be the most effective plaintiff if he cannot satisfy all of the elements of § 4. For purposes of clarity and in accord with what seems to be the approach of this circuit, *see*

*Local Beauty Supply*, 787 F.2d at 1201; *In re Indus. Gas Antitrust Litig. (Bicahn)*, 681 F.2d 514, 519–20 (7th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), and of the commentators, *see, e.g.*, Page, *supra*, at 1484–85, we prefer, however, to treat antitrust injury and standing separately. We will, therefore, refer to standing only when discussing the element of proximate cause. Of course, this is merely a matter of semantics and the essential elements of the § 4 action remain the same under either approach.

oriented approach to standing analysis). In *Associated General Contractors*, the Court identified factors we must consider in deciding whether a plaintiff has standing, such as "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed." *Cargill*, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6 (citing *Associated General Contractors*, 459 U.S. at 544–45, 103 S.Ct. at 912); *Southwest Suburban Board of Realtors*, 830 F.2d at 1377. Ultimately, standing involves a case-by-case analysis of "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated General Contractors*, 459 U.S. at 535, 103 S.Ct. at 907.

## A. Violation of the Antitrust Laws

### 1. The Sherman Act Claims

■ The plaintiffs allege that the defendants violated §§ 1 and 2 of the Sherman Act and the Gasohol Competition Act (section 26 of the Clayton Act). The plaintiffs voluntarily withdrew their monopolization claim under § 2 of the Sherman Act, and the district court dismissed that claim with prejudice. Plaintiffs do not attempt to resuscitate the claim here. With respect to the § 1 claims, a plaintiff, to show a violation, must establish a contract, conspiracy or combination intended to restrain competition and which actually has an anticompetitive effect. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553–54 (7th Cir.1980); *City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1365 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992). To show a conspiracy to restrain trade, a plaintiff must proffer evidence, either direct or circumstantial, " 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)); *Reserve Supply*, 971 F.2d at 48–49.

■ Plaintiffs have failed to show a § 1 violation because they have not presented evidence tending to show an agreement to restrain trade. Indeed, the conspiracy claim is belied by the fact that four of the eight defendants—Amoco, Arco, Chevron and Mobil—sold alcohol-blended gasoline during the time of the alleged conspiracy to restrain trade in gasohol.[8] The only evidence suggesting concerted action among the defendants is their common membership in organizations such as the American Society for Testing and Materials (ASTM), a private group which sets standards and specifications for, among other things, motor fuels. The defendants also belong to the American Petroleum Institute (API), a trade association representing all sectors of the domestic oil industry. The plaintiffs allege that the defendants combined in these organizations to restrain trade (1) by delaying issue of an ASTM motor fuel specification that included gasohol and (2) by lobbying governmental authorities through the API to discourage the marketing and acceptance of gasohol. Neither of these claims, however, amounts to a § 1 violation.

■ First, the failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1. In *Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284 (5th Cir.1988), a manufacturer of "sucker rods"—a steel rod used to pump oil from wells—argued that the API's delay in certifying its innovative product was an illegal restraint of trade in violation of § 1. The Fifth Circuit disagreed and affirmed summary judgment against the plaintiff. It held that "a trade association that evaluates products and issues opinions, without constraining others to follow its recommendations, does not *per se* violate section 1, when for whatever reason, it fails to evaluate a product favorably to the manufacturer." *Id.* at 292; *see also Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399–400 (7th Cir.1989). The Fifth Circuit then found that the delay in certification did not violate § 1 under a rule-of-reason

---

8. Chevron also held an ownership interest in an ethanol production plant at the time it was alleg-

edly conspiring against the sale of gasohol.

analysis. First, the plaintiff failed to show a conspiracy, for "a trade association is not by its nature a 'walking conspiracy.'" *Id.* at 293–94; *Wilk v. American Medical Ass'n,* 895 F.2d 352, 374 (7th Cir.), *cert. denied,* 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 524 (1990); *see also Moore v. Boating Indus. Ass'n,* 819 F.2d 693, 712 (7th Cir.), *cert. denied,* 484 U.S. 854, 108 S.Ct. 160, 98 L.Ed.2d 115 (1987) (membership in trade association alone not sufficient evidence of agreement to restrain trade). Second, there was no evidence of an intent to restrain trade, the court held, noting that the API followed its normal certification procedures. Finally, the court found no evidence of an anticompetitive effect because the certification, although influential, was not required to compete in the market. Reliance by oil pump buyers on the certification was voluntary, and the record indicated that the plaintiff had no problem selling its product without the API's certification.

The plaintiffs' § 1 claim fails here for analogous reasons. As we have noted, there is no evidence of concerted action. In addition, the plaintiffs have not proffered evidence of an unlawful purpose. The ASTM did not stray from its normal procedures. Indeed, the plaintiffs concede as much, but argue that "the defendants did not even adopt an emergency specification for gasohol, although ASTM procedures plainly provided that emergency specifications could be adopted to fill a pressing need while a proposal went through the normal ASTM standards-writing process and ballots." Pls.' and Intervs.' Mem. in Opp'n to Defs.' Mots. for Summ.J. at 62. The failure to take emergency steps to specify gasohol and proceeding through the normal specification process, however, is not evidence of an unlawful purpose. Finally, there is no evidence of an anticompetitive effect. The record indicates that in the period 1978–1987, during which the defendants,

acting through the ASTM, allegedly restrained trade by not issuing a gasohol specification, ethanol fuel sales increased continuously from 20 million gallons per year to 825 million gallons per year—a 4000 percent increase. It would be difficult to show an anticompetitive effect on ethanol sales in the face of this increase.

■ Moreover, the API's lobbying efforts do not support a § 1 claim. Under the *Noerr–Pennington* doctrine, lobbying that would arguably restrain trade is protected political activity and does not violate the antitrust laws. *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Although there is an exception from First Amendment protection for "sham lobbying," *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533, the Supreme Court has recently explained that "a sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable governmental action at all, not one who genuinely seeks to achieve his governmental result but does so *through improper means.*" *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, ——, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991) (citations and quotation marks omitted) (emphasis in original). Here, the plaintiffs do not allege that the lobbying efforts were not intended to get legislative results. In fact, the plaintiffs assert that the efforts achieved their desired legislative effect. Hence, these activities are protected and do not violate the Sherman Act.

### 2. *The Gasohol Competition Act Claims*

■ The only remaining basis for a violation of the antitrust laws lies in the claims under the Gasohol Competition Act, which we duplicate in the margin.[9] The plaintiffs

---

9. The Gasohol Competition Act of 1980 provides in full:

> (a) **Limitations on the use of credit instruments, sales, resales, and transfers**
> Except as provided in subsection (b) of this section, it shall be unlawful for any person engaged in commerce, in the course of such commerce, directly or indirectly to impose any

condition, restriction, agreement, or understanding that—
> (1) limits the use of credit instruments in any transaction concerning the sale, resale, or transfer of gasohol or other synthetic motor fuel of equivalent usability in any case in which there is no similar limitation on transactions concerning such person's conventional motor fuel; or

first assert that the oil companies engaged in an "anti-alcohol" campaign (1) by posting signs at their stations announcing that their products contain no alcohol, thus implying that there is something wrong with gasohol, and (2) by not including on such signs recognition of gasohol's quality. Initially, we doubt that the signs unreasonably discriminate against gasohol. In *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d at 400, for example, we held that an ophthalmological academy did not commit an antitrust violation by labeling a particular surgery "experimental." We found that the speech did not "restrain trade" but simply affected demand for the surgery by informing patients of its nature. We held that the appropriate remedy was not antitrust litigation but "more speech."

Even assuming that the signs here discriminate against gasohol, subsection (b)(3)(A) of the Act permits petroleum companies to label pumps dispensing gasohol to distinguish that product from other products manufactured and distributed by the companies. In addition, subsection (b)(3)(B) authorizes petroleum companies to issue disclaim-

ers of liability for any damage attributable to gasohol. The apparent intent of these provisions is to permit oil companies to distinguish petroleum products from gasohol and to disavow any adverse consequences from gasohol use. Signs stating "No alcohol" are not qualitatively different from those which the petroleum companies seem to be free under the Act to post—signs providing, in effect, that a product contains alcohol [10] and that the petroleum company did not manufacture the product and is not responsible for damage it may cause. Indeed, the signs posted by the defendants seem less likely to convey the message that gasohol is an inferior motor fuel than do signs which seem to be specifically permitted under the Act. With respect to the defendants' failure to include positive information about gasohol in its signs, subsection (b)(3)(C) explicitly provides that companies are not required to provide advertising support for gasohol.

The plaintiffs next argue that the defendants have refused to permit the use of existing tanks and pumps for storage and dispensing of gasohol and have done the

(2) otherwise unreasonably discriminates against or unreasonably limits the sale, resale, or transfer of gasohol or other synthetic motor fuel of equivalent usability in any case in which such synthetic or conventional motor fuel is sold for use, consumption, or resale within the United States.

**(b) Credit fees; equivalent conventional motor fuel sales; labeling of pumps; product liability disclaimers; advertising support; furnishing facilities**

(1) Nothing in this section or in any other provision of law in effect on December 2, 1980, which is specifically applicable to the sale of petroleum products shall preclude any person referred to in subsection (a) of this section from imposing a reasonable fee for credit on the sale, resale, or transfer of the gasohol or other synthetic motor fuel referred to in subsection (a) of this section if such fee equals no more than the actual costs to such person of extending that credit.

(2) The prohibitions in this section shall not apply to any person who makes available sufficient supplies of gasohol and other synthetic motor fuels of equivalent usability to satisfy his customers' needs for such products, if the gasohol and other synthetic fuels are made available on terms and conditions which are equivalent to the terms and conditions on which such person's conventional motor fuel products are made available.

(3) Nothing in this section shall—

(A) preclude any person referred to in subsection (a) of this section from requiring reasonable labeling of pumps dispensing the gasohol or other synthetic motor fuel referred to in subsection (a) of this section to indicate, as appropriate, that such gasohol or other synthetic motor fuel is not manufactured, distributed, or sold by such person;

(B) preclude such person from issuing appropriate disclaimers of product liability for damage resulting from use of the gasohol or other synthetic motor fuel;

(C) require such person to provide advertising support for the gasohol or other synthetic motor fuel; or

(D) require such person to furnish or provide, at such person's own expense, any additional pumps, tanks, or other related facilities required for the sale of the gasohol or other synthetic motor fuel.

**(c) Definition**

As used in this section, "United States" includes the several States, the District of Columbia, any territory of the United States and any insular possession or other place under the jurisdiction of the United States.

10. As we discuss, *infra*, a number of states have enacted laws requiring dealers to post "gasohol" or "contains alcohol" labels on their gasohol pumps.

same with respect to the storage and blending of ethanol. The plaintiffs maintain that this refusal is an unreasonable limitation on the sale of gasohol. They direct us to language in the House and Senate Reports on the gasohol legislation defining what an unreasonable limitation on the sale of gasohol includes. The House Report states

> Paragraph [ (a)(2) ] also prohibits unreasonable limitations on the sale of gasohol and other synthetic fuels. The phrase "unreasonably limits" was used to cover obstacles to the marketing of gasohol that were not necessarily discriminatory. For example, if an oil company forbids the use of its pumps and tanks for dispensing any non-company product, gasohol is not singled out, but its sale is impeded. This limitation, although nondiscriminatory, should be prevented and will be reached under paragraph [ (a)(2) ] of this act.

H.R.Rep. No. 1464, 96th Cong., 2d Sess. 6 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5393, 5397–98; *accord* S.Rep. No. 868, 96th Cong., 2d Sess., at 10–11 (1980) (same). The plaintiffs also recognize, and the defendants rely upon, subsection (b)(3)(D), which provides that the Act does not "require such person to furnish or provide, at such person's own expense, any additional pumps, tanks, or other related facilities required for the sale of the gasohol or other synthetic motor fuel." The plaintiffs, however, point to the word "additional" and argue that Congress only meant to relieve franchisors from the obligation of installing new equipment for gasohol distribution. Mindful that any exemptions from the antitrust laws are to be construed narrowly, "with beady eyes and green eye-shades," *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 961 F.2d 667, 672 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 409, 121 L.Ed.2d 334 (1992), we agree with the plaintiffs that this is the only interpretation consistent with the Act's language and intent. In fact, the House and Senate Reports specifically state that the exemption from furnishing additional facilities does not permit franchisors to prohibit dealers from using existing tanks

and pumps for the sale of gasohol. 1980 U.S.C.C.A.N. at 5398; S.Rep. No. 868 at 11. In addition, the plaintiffs have asserted that the defendants limited the use of credit instruments in the sale of gasohol. This is in direct violation of subsection (a)(1) of the Act, which makes it unlawful to limit the use of credit instruments in any gasohol transaction.

Viewing the record in the light most favorable to the plaintiffs, as we must on a motion for summary judgment, we find that there is a genuine issue of fact as to whether the defendants violated the Gasohol Act. Thus, for purposes of summary judgment, we assume the existence of a violation, and continue our review of the § 4 requirements to determine whether summary judgment against the plaintiffs was appropriate.

### B. *Antitrust Injury*

In *Brunswick*, the Supreme Court held that to maintain a § 4 action for treble damages, a plaintiff must show *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." 429 U.S. at 489, 97 S.Ct. at 697. We will analyze both of these requirements in turn.

### 1. *Type of Injury*

In determining whether the injury alleged is the type the antitrust laws were intended to prevent, the Supreme Court has directed us to look at " 'the type of loss that the claimed violations ... would be likely to cause,' " *Id.* at 489, 97 S.Ct. at 697 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)), or, in other words, to consider whether the injuries "fall squarely within the area of congressional concern." *McCready*, 457 U.S. at 485, 102 S.Ct. at 2551. Thus, when defining the scope of antitrust injury for a violation of the Gasohol Competition Act, it is the purpose of that legislation, and the interests it seeks to protect, which is controlling.[11] Upon reviewing the purposes

11. This comports with the approach taken by courts in defining antitrust injury for § 4 suits

predicated upon a violation of the Robinson-Patman Act. These courts have recognized that

of the Gasohol Act, we believe that the plaintiffs have alleged the type of injury the Act was intended to avert.

 The basic intent of the Gasohol Act, as gleaned from the House and Senate Reports, is "simply to promote generally the sale of gasohol and other synthetic fuels and not to affect the sale of specific brands of those products." 1980 U.S.C.C.A.N. at 5395. The House Report provides

> In recent months, there has been increasing recognition of the need for rapid and effective development of alternative energy sources to offset this nation's dependence on the ever-dwindling supply of foreign and domestic oil. One program that will help to decrease America's reliance on foreign energy sources is the production and use of gasohol. Should the consuming public be denied the opportunity to purchase such alternative fuels, public and private efforts to encourage alternative fuel development will be frustrated.

*Id.; accord* S.Rep. No. 868 at 5. The second, more specific purpose of the Act is to "ensure that retailers and distributors of synthetic fuels, including gasohol, will not be discriminated against by their suppliers and/or owners of their retail stations because of sales of synthetic fuels." 1980 U.S.C.C.A.N. at 5393; *accord* S.Rep. No. 868 at 2 ("Moreover, the committee wants to insure that dealers will be permitted to market newly developed alternative fuels when those fuels reach gaso-

hol's level of quality and acceptability."). Therefore, the congressional purpose in enacting the Gasohol Competition Act transcends the short-term economic interests of consumers. The Gasohol Act was intended to promote the development of alternative motor fuels. It did this not only by protecting *competition* generally, but went further by protecting, in a limited way, *competitors*—those who develop, produce and market alternative motor fuels. Unlike the Sherman Act, the Gasohol Competition Act imposes affirmative obligations on companies to promote the growth of gasohol, such as requiring companies to permit dealers to use company tanks and pumps for the sale of gasohol and to extend credit for gasohol purchases on terms equal to those offered for non-gasohol purchases.

 The defendants argue that the interests protected by the Act are solely those of the dealers and distributors, and thus maintain that only dealers and distributors may suffer antitrust injury from a violation of the Gasohol Act. They rely on *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 828 F.Supp. 794 (D.Nev.1991), where the court held that two marketers of gasohol did not have standing to sue under the Gasohol Act because the Act "confers standing only upon franchisees or those who have directly acquired petroleum products from the supplier accused of the discriminatory or limiting behavior." *Id.* at 4. But *Rebel Oil* cites only those portions of the House Report that refer to franchisees

the interests Congress sought to protect in enacting the Sherman Act and the Robinson–Patman Act "do not mirror one another," *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1540 n. 17 (3d Cir.1990); *see also United States v. United States Gypsum Co.*, 438 U.S. 422, 450–51, 98 S.Ct. 2864, 2880, 57 L.Ed.2d 854 (1978) (noting distinction and potential tension between Sherman Act and Robinson–Patman Act). Thus, courts have relied on the purposes of the Robinson–Patman Act to determine whether the plaintiffs have satisfied the antitrust injury requirement for a Robinson–Patman violation. *See, e.g., J.F. Feeser*, 909 F.2d at 1533–35, 1539–41 & n. 17 (secondary-line plaintiff need only show injury to competitor to satisfy competitive injury requirement, and correspondingly, the antitrust injury requirement; injury to consumers unnecessary); *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1418 n. 6, 1426–28 (11th Cir. 1990) (same); *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir.1987) (noting that "in

order for a plaintiff to prove competitive injury under Robinson–Patman, he need only show that a substantial price discrimination existed as between himself and his competitors over a period of time."), *aff'd on other grounds*, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); Areeda & Hovencamp, *supra*, ¶ 340.5 (citing with approval finding of antitrust injury in favor of injured competitor in *Hasbrouck*). Indeed, even the courts which have held the interpretation of "competitive injury" under the Robinson–Patman Act to be analogous to that applied under the Sherman Act have done so by reviewing the intent and legislative history of the Robinson–Patman Act, concluding only then that the two acts have similar purposes. *See, e.g., Boise Cascade Corp. v. FTC*, 837 F.2d 1127, 1138–39, 1143–48 (D.C.Cir.1988) (reviewing purpose of Robinson–Patman Act and concluding that, as in the case of the Sherman Act, absence of consumer injury is evidence in rebuttal of showing of competitive injury).

and distributors. It is true that the Act was enacted to protect dealers and distributors, but that was not the only, or even the most central, purpose of the Act.

In that connection, the Senate Report, in summarizing the purposes of the Act, states: "In order to relieve our tenuous energy supply, the committee believes that domestically available alternatives to conventional oil and gas resources are necessary. It is to this effort that [the Gasohol Competition Act] is addressed." As this and other provisions demonstrate, the protection of dealers is simply a *means* to the end of promoting the sale of gasohol and other synthetic motor fuels. *See, e.g.,* 1980 U.S.C.C.A.N. at 5393 (the Act "will promote the sale of gasohol and other synthetic motor fuels by ensuring that franchisees of existing major oil companies can utilize the company's credit arrangements and marketing facilities to promote these alternative sources of energy and to preclude unreasonable discrimination against dealers desiring to market these synthetic fuels."). Confining the interests protected by the Act to those of dealers and consumers so that only they are capable of suffering antitrust injury, is belied by the overall purposes of the Act. Indeed, we believe that the interests protected by the Act extend beyond the simple sale and marketing of gasohol—and therefore the interests of gasohol blenders and dealers—and include the development and production of alcohol-blended motor fuels. *Id.* at 5395; *see also* S.Rep. No. 868 at 1 (emphasizing "urgent need for rapid and effective development of viable alternative fuels to offset … dependence on … foreign oil").[12] Hence, the interests of ethanol manufacturers and sellers, integral to the promotion and development of gasohol, "fall squarely within the area of congressional concern." *McCready,* 457 U.S. at 485, 102 S.Ct. at 2551. Accordingly, we believe that these blenders, manufacturers and sellers all may suffer the type of injury that Congress meant to preclude.[13]

### 2. *"But for" Cause*

To satisfy the antitrust injury requirement, a § 4 plaintiff must show that its injury "flows from that which makes defendants' acts unlawful," *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697—that "but for" the alleged violation, the injuries would not have occurred. *MCI,* 708 F.2d at 1161; Areeda & Hovencamp, *supra,* ¶ 334.3a; Page, *supra,* at 1461. An antitrust violation need not be the sole cause of the alleged injuries, but the plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury. *See Zenith Radio Corp.,* 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9; *Tire Sales Corp. v. Cities Serv. Oil Co.,* 637 F.2d 467, 474–75 (7th Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981). The proof required to show *causation* of damages is greater than that required to prove the *amount* of damages, where a plaintiff is afforded more latitude due to the "vagaries of the marketplace." *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981); *MCI,* 708 F.2d at 1168.[14]

In *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 44 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987), for example, a wholesaler of photography equipment and a licensor of camera equipment sued Kodak for damages resulting from Kodak's Sherman Act violation in signing a confidentiality agreement with the de-

---

**12.** Although these purposes may transcend to a degree the accustomed, consumer-oriented purposes of the "antitrust" laws, we do not think that Congress's concern for fostering new products and new competitors in this context in any way marks the Gasohol Act as something other than an antitrust law, or the injury resulting from its violation as something other than an antitrust injury.

**13.** The mere showing that gasohol blenders and ethanol manufacturers and sellers may suffer the type of injury protected against by the Gasohol Act does not mean that these categories of interests necessarily have *standing* to sue for a violation of the Act. As noted, antitrust *injury* and antitrust *standing* involve two separate inquiries. The crux of the standing analysis is whether the plaintiff is the proper party to vindicate the antitrust interest.

**14.** In ascertaining the amount of damages, the plaintiff nonetheless must be able to trace its damages to the injury which was in fact caused by the violation. *MCI,* 708 F.2d at 1168.

veloper of a new and improved flash unit. The Second Circuit affirmed the grant of summary judgment against the plaintiff on the ground that the plaintiffs failed to show that, but for the antitrust violation, they would not have suffered the losses they alleged. The plaintiffs had been suffering economic hardship before the antitrust violation, had recently lost the supplier of their lead line of camera and had lacked a supplier for a projected leading product. *See also Southwestern Sheet Metal Works, Inc. v. Semco Mfg., Inc.,* 788 F.2d 1144, 1145–47 (5th Cir. 1986) (holding that plaintiff failed to show, given the existence of other competitive bidders, that but for the violation granting a competitor a bidding advantage, plaintiff would have been awarded the projects at issue), *cert. denied,* 480 U.S. 917, 107 S.Ct. 1370, 94 L.Ed.2d 686 (1987); *Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 268–72 (D.C.Cir. 1981) (holding that mail-order prescription service failed to show that, but for the American Pharmaceutical Association's attempt to restrain mail-order competition, it would not have undertaken the expense of identifying forged prescriptions), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).

■ Defendants identify numerous intervening economic and market factors which they argue may have been the actual cause of the plaintiffs' injuries. They contend that the alleged antitrust violations played an insignificant role (or none at all) in the plaintiffs' economic woes, and that therefore no reasonable trier of fact could find that the violation *caused* the plaintiffs' injuries. We agree and find that as a matter of law, plaintiffs have failed to show with a fair degree of certainty that the antitrust violation was a material and substantial factor causing their alleged injuries. Hence, the plaintiffs did not suffer antitrust injury.

There are many alternative explanations for the injuries which the plaintiffs allege. First, many automobile owner's manuals warned consumers against the use of motor fuels containing alcohol. For example, the owner's manual for the 1986 Chrysler LeBaron GTS stated that "Chrysler does not recommend using fuels containing alcohol because some gasoline/alcohol blends may degrade the starting, driveability and fuel efficiency of your vehicle." Numerous other owner's manuals of record suggested precautions owners should take when using gasoline containing alcohol. These precautions involve, among other things, verifying the amount and type of alcohol blended with the gasoline.[15] These cautionary counsels likely dissuaded some owners from using gasohol.

Second, reports in the media criticized alcohol-blended motor fuels and discouraged the use of gasohol by consumers. In particular, the April, 1987, issue of *Consumer Reports* suggested that consumers "avoid gasoline/alcohol blends altogether—if you can."

Third, a number of state laws hurt gasohol sales by requiring retailers to post pump labels disclosing that a motor fuel contained alcohol. A Louisiana law adopted in 1986 was particularly damaging to gasohol sales. This labeling law required a black and gold label with three-inch letters stating that the fuel was "gasohol" or "contains ethanol." After enactment of the law, gasohol sales in Louisiana—where seven of the thirteen plaintiffs operated—"dropped anywhere from approximately 66 to 72 percent" according to Robert Love, the general manager of one of the plaintiffs, Cajun Energy. Representatives of other plaintiff companies also acknowledged the negative effect of the labeling law, reflected in reduced sales and lost clients. One of the plaintiffs' experts, J.B. Smith, for example, acknowledged that the labeling law "killed ethanol in the marketplace." Mr. Smith further maintained that a Florida labeling law reduced sales by 33 percent.

Fourth, states that had exempted gasohol in whole or in part from state fuel taxes eliminated or reduced those exemptions. Since 1986, twenty-seven of the thirty-three states that had enacted exemptions eliminat-

---

**15.** The record contains owner's manuals from the 1991 Honda Accord, 1990 Mitsubishi Eclipse, 1986 Nissan Stanza Wagon, 1986 Porsche Audi, 1984 Saab 900, 1986 Subaru, 1984 Toyota Tercel, 1984 Volkswagen Rabbit, 1987 AMC, 1989 Eagle Summit, 1989 Dodge Ram, 1985 Ford Tempo, 1984 Buick Regal, 1986 Buick Riviera and 1986 Chevrolet.

ed or reduced them.[16] This increase in taxes made gasohol more expensive, effectively reducing the price gasohol marketers would pay for gasohol and gasohol blenders would pay for ethanol.

Fifth, the drop in gasoline prices in 1986 caused a corresponding drop in ethanol prices which inflicted serious financial consequences on the plaintiffs. Wendall Harris, president of plaintiff CEPO, summarized the result of the drop in gas prices:

> The past several months have witnessed a drastic decline in gasoline prices which, in turn, leads to a corresponding decline in ethanol prices. In January [1986], the price was $1.56, by March it fell to $1.20, and by May it sank to $.97. Our company has undergone serious financial loss for the past several months due, in substantial part, to those price declines.

Representatives of other plaintiff companies echoed these views about the effect of the decline in gas prices on gasohol and ethanol prices.

Sixth, the United States Department of Agriculture in 1986 instituted a program to subsidize grain-based ethanol producers. The subsidy effectively reduced the raw material costs of grain-based ethanol producers by forty percent by giving them one free bushel of grain for every two and one-half used. Most of the present plaintiffs could not take advantage of the subsidy because they relied on other, non-grain feedstocks, such as molasses. Two of the current plaintiffs—Alpebo and Shepherd—being molasses-based producers, sued the Secretary of Agriculture in an attempt to defeat the subsidy, arguing that the subsidy would "give grain-based producers a competitive advantage over plaintiffs, which they will use to drive the price of ethanol down to a point at which plaintiffs are unable to compete."

Richard Dodd, vice-president of plaintiff Shepherd Oil, related that the subsidy would permit its grain-based competitors to drive down prices to a point where Shepherd would not have the financial strength to compete very long. He noted that this was true especially given that the price of Shepherd's feedstock, molasses, had nearly doubled in one year. Similarly, Mr. Harris of CEPO candidly stated that unless CEPO was eligible for the same or a similar subsidy, "I strongly doubt whether CEPO would stay in the ethanol market for any length of time. We cannot sell into a market at prices which guarantee losses."

Seventh, in 1987 Louisiana terminated its state subsidy providing $1.40 for each gallon of ethanol produced and sold in Louisiana. Four of the current plaintiffs—Alpebo, Shepherd, Shreveport and Vidalia—were ethanol producers in Louisiana,[17] and were seriously hurt by the loss of the subsidy. Instead of collecting the price of a gallon of ethanol plus the subsidy of $1.40 for every gallon of ethanol produced, Louisiana ethanol producers were suddenly collecting only the price per gallon the market would allow. Matthew Kling, former director of marketing and commodities for Shepherd Oil, conceded that "Shepherd was not a profitable business because its ethanol production was reliant on state subsidies. It is simple economics to determine that, if ethanol is priced competitive with the price of gasoline, it simply cannot be sold at a consistent profit by small producers without a state subsidy." Representatives from other plaintiffs also acknowledged that once the subsidy stopped, the ethanol industry in Louisiana all but shut down.

Finally, the plaintiffs conceded that they did not enjoy sufficient economies of scale to compete effectively against larger, grain-based ethanol producers, like Archer Daniels

---

**16.** The states exempting gasohol in whole or in part from state fuel taxes in 1985 were Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, South Dakota, Tennessee, Texas, Utah, Virginia, Washington and Wyoming. Of these, only Alaska, Connecticut, Hawaii, Idaho, Washington and Wyoming have not since eliminated or reduced the exemption. Only Missouri and South Carolina have begun to exempt gasohol since 1985 without any subsequent reduction or elimination of the exemption.

**17.** Three other plaintiffs—Wurster, Cajun Energy and Public Terminals—were Louisiana-based wholesale marketers of ethanol and gasohol.

Midland (ADM), a midwestern grain-based producer with approximately 60 percent of the U.S. ethanol market.[18] Kling testified that the large midwestern ethanol producers were able to achieve economies of scale, were more reliable and could compete more effectively due to their direct rail access, location near the grain supply and ability to sell some of their by-products. Representatives of High Plains, Greater Rockford, Lakefield Ethanol and Shepherd recognized that ADM had significant economies of scale, and was able to produce more ethanol, of better quality and at a lower price per gallon than any of the plaintiffs.

Standing alone one of these alternative causes of the plaintiffs' injuries might be insufficient to put causation-in-fact in question. Taken together, however, the plaintiffs have failed to show with a fair degree of certainty that "but for" the alleged antitrust violation, the plaintiffs would not have suffered the injuries of which they complain. Consequently, as a matter of law the plaintiffs have failed to show antitrust injury, and summary judgment was, therefore, appropriate.

### III.

Because a showing of both antitrust injury and antitrust standing are necessary to proceed under § 4, the plaintiffs' inability to show antitrust injury is a sufficient basis for dismissing their case; we need not address the other issues raised on appeal. The lack of antitrust injury, moreover, is fatal to their claim for injunctive relief under § 16 of the Clayton Act. *See Cargill*, 479 U.S. at 113, 107 S.Ct. at 491. This conclusion is buttressed by the fact that all but one of the plaintiffs have gone out of business, and thus, cannot show threatened loss or damage by the defendants' conduct. Accordingly, the judgment of the district court is

AFFIRMED.

---

18. In 1985, eight grain-based ethanol producers controlled approximately 90 percent of all ethanol production in the United States.

