Joseph **SERFECZ** and First Chicago Trust, Plaintiffs–Appellants,

v.

**JEWEL FOOD STORES, et al.,**
Defendants–Appellees.

Nos. 94–3211, 94–4017 and 95–1201.

United States Court of Appeals,
Seventh Circuit.

Argued May 11, 1995.

Decided Sept. 26, 1995.

Wayne E. Dekens, Lynda J. Khan (argued), Khan & Associates, Chicago, IL, for Joseph Serfecz, and First Chicago Trust Company of Illinois.

David Marx, Jr. (argued), Anne R. Pramaggiore, David B. Bayless, Christine M. Drylie, McDermott, Will & Emery, Chicago, IL, for Jewel Food Stores, Incorporated and American Stores Properties, Incorporated.

Steven H. Cohen, Henry C. Krasnow (argued), Jeremy W. Hobbs, Krasnow, Sanberg & Cohen, Chicago, IL, for Patrick F. Daly, Patrick F. Daly & Associates, Limited, DEI Incorporated and Dalan/Jupiter, Incorporated.

James P. Chapman, Chapman & Associates, Chicago, IL, Robert A. Chapman, Chicago, IL, for United Skates of America, Incorporated.

Before CUDAHY, ESCHBACH and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Joseph Serfecz and First Chicago Trust Company of Illinois ("First Chicago Trust") have ownership interests in the Grove Mall in Elk Grove Village, Illinois. They claim that Jewel Food Stores ("Jewel"), American Stores Properties, Inc. ("American Properties"), and the developers of competing Elk Crossing Mall have conspired to run Grove Mall out of business and to monopolize the retail grocery and shopping center markets in Elk Grove Village. They brought this action alleging defendants violated the Sherman Act, 15 U.S.C. §§ 1, 2. They also alleged supplemental state law claims of malicious prosecution and breach of lease. The district court granted the defendants' motions for summary judgment with regard to the antitrust and malicious prosecution claims and granted a partial summary judgment with regard to the breach of lease claim. Mr. Serfecz and First Chicago Trust now appeal that judgment.[1] For the reasons set forth below, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

In 1963, Jewel entered into a lease for retail space in Grove Mall. Jewel's lease ran until 1986 and provided Jewel with three five-year options to renew. In 1977, Mr. Serfecz purchased Grove Mall and assumed all existing leases including the Jewel lease. In 1986, Jewel exercised its first option to renew and in 1991 it exercised its second option. Jewel's current lease expires in 1996 and, based upon the remaining five-year option, may be extended until 2001.

From 1963 until 1987, Jewel owned and operated a grocery store in its leased premises at Grove Mall. In October 1987, Jewel vacated the premises and moved its grocery operation across the street to the newly constructed Elk Crossing Mall. Since its move, Jewel has continued to pay rent and has exercised its second option to renew the lease. Jewel has refused to give up its leasehold interest in the premises and its retail space has remained unoccupied. Jewel proposed to sublet the space to United Skates of America ("United Skates") for use as a roller skating rink. Mr. Serfecz objected to this proposed sublease because he believed occupancy by United Skates would ruin Grove Mall as a retail center and increase his insurance liability. In 1990, Jewel filed an action in state court that sought a declaratory judgment regarding its right to sublet. The Illinois trial court ruled against Jewel; it held that the express provisions of the lease gave Mr. Serfecz the right to refuse any sublet that would increase his insurance rates. The appellate court affirmed.

Mr. Serfecz, joined by First Chicago Trust,[2] brought this action against Jewel,

---

1. The district court had jurisdiction of Counts I and II under 15 U.S.C. § 26 and 28 U.S.C. § 1337. The district court had supplemental jurisdiction over Counts III and IV under 28 U.S.C. § 1367(a). On January 10, 1995, the district court granted defendants' motion for summary judgment on Counts I, II, III and part of IV. The court did not grant summary judgment as to the portion of Count IV claiming breach of lease

due to an unlawful use of the premises. Pursuant to Federal Rule of Civil Procedure 54(b), the district court determined that there was no reason to delay entry of final judgment in favor of defendants on all claims except the unlawful use claim in Count IV or to delay appeal from that judgment.

2. First Chicago Trust Company of Illinois, Trustee of Trust No. 684 is the title holder of Grove

American Properties,[3] United Skates,[4] and the developers and operators of the Elk Crossing Mall.[5] That complaint claimed that the defendants conspired to devalue and to destroy Grove Mall in order to eliminate competition in the retail grocery and shopping center markets. The plaintiffs contend that the defendants conspired to keep the Jewel rental space empty, to prevent a major anchor tenant from taking over Jewel's rental space, to obstruct Mr. Serfecz's attempt to redevelop Grove Mall, and to coerce Grove Mall tenants to leave and move across the street to Elk Grove Mall. The plaintiffs maintain that the alleged conspiracy is part of an overall marketing strategy of restricting the use of property in order to keep out competitors and to restrain trade. In Counts I and II of their complaint, plaintiffs alleged defendants violated § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. In Count III plaintiffs allege Jewel's declaratory judgment action regarding the United Skates sublet was malicious prosecution and in Count IV allege breach of lease by Jewel.

### B. *The Antitrust Laws: The Relevant Statutory Provisions*

Section One of the Sherman Act prohibits anticompetitive activities designed to restrain unreasonably trade and bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce...." 15 U.S.C. § 1. Section Two prohibits monopolistic practices and provides sanctions for "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce...." 15 U.S.C. § 2.

Section Four of the Clayton Act defines the class of persons who may bring a private

suit under the antitrust laws. Section Four provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15. The Supreme Court has held that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 892 n. 14, 31 L.Ed.2d 184 (1972). The language of § 4 has been construed to limit the parties who may bring an antitrust action to (1) those who have suffered the type of injury that the antitrust laws were intended to prevent and (2) those whose injuries are a result of defendant's unlawful conduct. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977). The Court, focusing on Congress' intent to have antitrust laws construed in light of the common law, also has read § 4 to contain a proximate cause element, denying standing to plaintiffs whose injuries are indirect or secondary. *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540–46, 103 S.Ct. 897, 909–12, 74 L.Ed.2d 723 (1983). The Court has identified several factors to be considered in determining whether a plaintiff is the proper party to bring a private action under the antitrust laws: (1) the causal connection between the antitrust violation and the plaintiff's injury;

---

Mall. Joseph Serfecz is the beneficial owner of the trust.

**3.** American Properties, Inc. is the company that manages properties owned and rented by Jewel.

**4.** United Skates of America, Inc. is an Ohio Corporation that operates roller skating rinks and is licensed and doing business in Illinois.

**5.** The complaint lists five defendants connected with the development of Elk Crossing Mall: Patrick F. Daly and Associates, Inc., the architect for

Elk Crossing Mall; D.E.I., Inc., the contract purchaser of the land on which the Elk Crossing Mall was built; Dalan/Jupiter, Inc., a developer of Elk Crossing Mall; Mid–America Real Estate Corporation, the leasing agent for Dalan/Jupiter, Inc. and Elk Crossing Mall; and Patrick F. Daly, an officer, director, and shareholder of Patrick F. Daly and Associates, Inc., D.E.I., Inc., and Dalan/Jupiter, Inc., and owner of a limited partnership interest in Elk Crossing Mall.

(2) the nature of the plaintiff's injury and the relationship between the plaintiff's injury and the type of activity sought to be redressed under the antitrust laws; and (3) the speculative nature of the plaintiff's claim for damages and the potential for duplicative recovery or complex apportionment of damages. *Associated Gen. Contractors,* 459 U.S. at 537–46, 103 S.Ct. at 908–12; *see also Nelson v. Monroe Regional Medical Ctr.,* 925 F.2d 1555, 1562 (7th Cir.), *cert. dismissed,* 502 U.S. 903, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991).

### C. The District Court Proceeding

The district court granted the defendants' motion for summary judgment on the antitrust claims. With respect to the monopolization of the retail grocery market claim, the court held that the plaintiffs lacked antitrust standing. The court held that the plaintiffs had presented enough evidence for a trier of fact to find that Jewel acted deliberately to prevent a competitor from occupying Jewel's rental space and to find a causal connection between the absence of a grocery store anchor tenant and the demise of Grove Mall. The court concluded that plaintiffs' injury was, nevertheless, too indirect to confer standing with respect to the retail grocery market. With respect to the retail shopping center market, the court determined that the plaintiffs had standing, but that they had failed to establish a genuine issue of triable fact as to the existence of the conspiracy among the defendants to restrain trade and to monopolize sales and development in this market.

The district court also granted defendants' motion for summary judgment on the malicious prosecution claim. It held that plaintiffs had failed to allege a special injury. The court additionally granted defendants' motion for summary judgment on the breach of lease claim insofar as the plaintiffs' claim was based upon Jewel's failure to continue operating as a grocery store at Grove Mall. The court denied the defendants' motion to the extent that the plaintiffs' claim was based upon the illegal use provision of the lease. It determined that the broad nonrestrictive wording of the illegal use provision prohibited using the premises to violate the antitrust

laws. The court reasoned that, although the plaintiffs lacked antitrust standing to recover damages for the monopolization of the grocery market, they did have standing, as parties to the lease, to sue for breach of the lease provision relating to violations of the law, arguably including violation of § 2 of the Sherman Act. In the district court's view, "use of the leased premises in furtherance of a Section 2 antitrust violation could indeed constitute a breach of the lease." Mem.Op. at 38. As we have noted earlier, *supra* n. 1, this issue is not before us today.

## II

### DISCUSSION

 We review de novo the district court's grant of summary judgment. We evaluate the evidence in a light most favorable to the nonmoving party. *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). Summary judgment is appropriate when the pleadings and supplemental materials present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To survive a defendant's motion for summary judgment, a plaintiff must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Greater Rockford Energy & Technology Corp.,* 998 F.2d at 394.

### A. The Antitrust Claims

 The Sherman Act was enacted "to assure customers the benefits of price competition, and ... protect[ ] the economic freedom of participants in the relevant market." *Associated Gen. Contractors,* 459 U.S. at 538, 103 S.Ct. at 908; *see Sanner v. Board of Trade,* 62 F.3d 918, 926 (1995). In this case, there are two relevant markets—the retail grocery market and the retail shopping center market. In order to maintain an anti-

trust action, plaintiffs must establish that they (1) have suffered an antitrust injury and (2) are the proper plaintiffs to maintain an antitrust action with respect to each of these markets. *See Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1202 (7th Cir. 1986); *In re Industrial Gas Antitrust Litig.*, 681 F.2d 514, 515 (7th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983).

### 1. The Retail Grocery Market

■■■ The district court determined that plaintiffs had presented enough evidence to permit a trier of fact to conclude that defendants had acted deliberately to prevent a competitor from occupying Jewel's rental space and that the absence of a grocery store anchor tenant was a significant cause of Grove Mall's decline. A private antitrust plaintiff, however, does not acquire standing merely by showing that he was injured by the defendant's conduct. In addition to establishing a link between the defendant's acts and the plaintiff's injuries, the Supreme Court has held that:

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. at 698 (citations omitted). This test focuses on the connection between the purpose of the antitrust laws (protecting market competition) and the alleged injury. When the plaintiff's injury is linked to the injury inflicted upon the market, such as when consumers pay higher prices because of a market monopoly or when a competitor is forced out of the market, the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition.

■■■ It is not contested that Mr. Serfecz brings this action neither as a consumer nor

as a competitor in the retail grocery market, but as a lessor of rental space to competitors in this market. Suppliers to direct market participants typically cannot seek recovery under the antitrust laws because their injuries are too secondary and indirect to be considered "antitrust injuries." *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1379 (7th Cir.1987); *see also Stamatakis Indus. v. King*, 965 F.2d 469, 471 (7th Cir.1992) ("[A] producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other."); *Bodie–Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 290–91 (6th Cir.1992) (holding that injury to broker through loss of commission was not "antitrust injury"). In *Southwest Suburban*, a trade association that provided listing services to real estate brokerage firms alleged that the defendants conspired to boycott, and encouraged customers to boycott, the plaintiff's listing service. Consequently, the trade association was unable to provide a comprehensive listing of properties to its subscribers. The defendants allegedly had taken action directly against the trade association to reduce the value of its listing in order to exclude non-preferred brokers from the real estate brokerage services market. The court held, however, that the defendants' anti-competitive practice was directed at the members of the trade association, not the trade association itself, and that any injury to the trade association, as a supplier of listing services, was too remote from the antitrust violation to confer standing. *Southwest Suburban*, 830 F.2d at 1379. We believe that the plaintiffs are in a similar position to that trade association and are best characterized as suppliers to the market participants, retail grocery stores and grocery purchasers.

In *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983), our colleagues in the Sixth Circuit held that an owner-lessor of retail commercial space did not have standing to maintain an antitrust action against a grocery store retailer who would not release its rental space to allow the plaintiff to lease the space to a different grocery store. The plaintiff claimed that the defendants intended to monopolize the retail

grocery market by destroying the site as a location for the operation of a retail grocery outlet. The Sixth Circuit held that the plaintiff's injury (rental devaluation) as a supplier of retail space to direct participants in the retail grocery market was not "sufficiently linked to the pro-competitive policy of the antitrust laws." *Southaven*, 715 F.2d at 1087; *see also Rosenberg v. Cleary, Gottlieb, Steen & Hamilton*, 598 F.Supp. 642 (S.D.N.Y.1984) (holding that owner and developer of shopping mall alleging defendants conspired to keep it from opening a grocery store by filing state court lawsuits and preventing building permits from being issued lacked standing because developer was not a direct participant in the retail grocery market).

Here, the plaintiffs' injury is not the direct effect of the defendants' anticompetitive conduct. Assuming Jewel's goal was to gain control of the retail grocery market in Elk Grove, Illinois, we do not believe that the damages claimed by plaintiffs (devaluation of Grove Mall) present the type of anticompetitive injury that the antitrust laws were intended to remedy. *See Sanner*, 62 F.3d at 925–926 (7th Cir.1995).

▮▮▮▮ Even if plaintiffs' injury could be characterized as an antitrust injury, this factor alone would not confer standing: "From the class of injured persons suffering an 'antitrust injury' only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under § 4." *In re Industrial Gas Antitrust Litig.*, 681 F.2d at 516. "The existence of an identifiable class

of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general ... [particularly when denying standing] is not likely to leave a significant antitrust violation undetected or unremedied." *Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. at 911. Our decisions have recognized the need to balance the interests of deterrence through private antitrust enforcement and avoidance of excessive treble damages litigation. "An appropriate balance is achieved by granting standing only to those who, as consumers or competitors, suffer immediate injuries with respect to their business or property, while excluding persons whose injuries were more indirectly caused by the antitrust conduct." *In re Industrial Gas Antitrust Litig.*, 681 F.2d at 520. If the competing grocery stores have been precluded from the market and injured by defendants' actions, their injuries would be direct and they could maintain an antitrust action against the defendants. *See Southwest Suburban*, 830 F.2d at 1379–80; *Southaven*, 715 F.2d at 1086–87; *In re Industrial Gas Antitrust Litig.*, 681 F.2d at 520. Similarly, grocery consumers could maintain an action if defendants' actions stifled competition allowing defendants to engage in monopoly pricing in the retail grocery market.[6] Suppliers of rental space to grocery retailers are not the proper parties to maintain an antitrust action with respect to the defendants' alleged monopolistic and anticompetitive activities in the retail grocery market.[7] In sum, we hold that these plain-

6. *See Nelson v. Monroe Regional Medical Ctr.*, 925 F.2d 1555, 1563–65 (7th Cir.), *cert. dismissed*, 502 U.S. 903, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991) (holding that patients who were denied medical treatment on non-emergency basis had standing to bring antitrust action against medical center); *Ball Memorial Hosp., Inc. v. Mutual Hosp., Inc.*, 784 F.2d 1325, 1334 (7th Cir.1986) ("When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust."); *see also* II Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 370 at p. 253 (Rev. ed. 1995) ("Because protecting consumers from monopoly pricing is the central concern of antitrust, buyers have usually been preferred plaintiffs in private antitrust

litigation. As a result, consumer standing to recover for an overcharge paid directly to an illegal cartel or monopoly is seldom doubted.").

7. *See Southwest Suburban*, 830 F.2d at 1379–80; *Southaven*, 715 F.2d at 1086–87; *In re Industrial Gas Antitrust Litig.*, 681 F.2d at 520; *see also International Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1329 (3d Cir.1992) (holding that operator of storage facility who was neither a consumer nor producer of soda ash lacked standing to bring antitrust action against producers of soda ash where direct participants in market would be better plaintiffs), *cert. denied*, ⸺ U.S. ⸺, 113 S.Ct. 1588, 123 L.Ed.2d 154 (1993); *Bodie–Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 290–91 (6th Cir.1992) (con-

tiffs do not have the requisite direct injury to have standing to assert that Jewel has monopolized, or conspired with others to monopolize, the retail grocery market. We express no opinion on whether, in a suit brought by another plaintiff who can show the requisite direct injury, such allegations could be established.

### 2. Retail Shopping Center Market

■ The plaintiffs' antitrust allegations are not limited to the retail grocery market. They also allege that the defendants had conspired to restrain trade and to monopolize sales in the retail shopping center market. Here, the district court quite correctly determined that the plaintiffs, who are direct participants in this market, alleged an injury that is sufficiently direct to give them standing.

■ Section One of the Sherman Act prohibits the formation of any "contract, combination ... or conspiracy in restraint of trade or commerce...." 15 U.S.C. § 1. To establish a violation of § 1 of the Sherman Act, plaintiffs must provide, therefore, evidence that "tends to exclude the possibility of independent action by the [defendants]." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1472, 79 L.Ed.2d 775 (1984). When a plaintiff relies on circumstantial evidence, as is very often the case, he "must show that the inference of conspiracy is reasonable in light of the competing inference[ ] of independent action." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356; *see Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992). Because there is often only a fine line sepa-

rating unlawful concerted action from legitimate business practices, "[c]onduct [that is] as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588, 106 S.Ct. at 1356. In *Market Force, Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167 (7th Cir.1990), we set forth our approach to evaluating the legal sufficiency of the evidence in antitrust-conspiracy cases. We first review the evidence of conspiracy submitted by the plaintiff. Next, we examine whether the defendants have offered evidence that tends to show that the conduct which forms the basis of the plaintiff's complaint is as compatible with the legitimate business activities of the plaintiff as it is with illegal conspiracy. Finally, if we determine that this analysis leaves the evidence of conspiracy ambiguous, we determine whether the plaintiff can point to any evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests. *Id.* at 1171–72.

■ Plaintiffs submit that Jewel and the Elk Crossing defendants engaged in a conspiracy to restrain trade in the retail shopping center market. They point out that both Jewel and the Elk Crossing defendants had a compelling motive to eliminate Grove Mall as a competitor. They also note that the Elk Crossing defendants built Elk Crossing without investigating the possibility that Grove Mall would be redeveloped and emerge as a competitor. They further point out that Jewel and the Elk Crossing defendants have built other shopping centers with Jewel as an anchor tenant, where Jewel obtained restrictions precluding the use of its old leasehold location as either a retail food store or a drug store.

cluding that broker of snacks and candies lacked standing to bring an antitrust action against snack and candy manufacturer where targets of alleged conspiracy, competing manufacturers and wholesale customers, were more direct victims); *S.D. Collectibles, Inc. v. Plough, Inc.*, 952 F.2d 211, 213–14 (8th Cir.1991) (determining that broker who solicited orders for resale of product and was not a consumer or competing manufacturer or distributor lacked standing to bring antitrust action against manufacturers and distributor of product); *Peck v. General Motors Corp.*, 894 F.2d 844, 847–48 (6th Cir.1990) (holding that owners and officers of automobile deal-

ership who were neither consumers nor competitors in automobile market lacked standing to bring antitrust action against automobile manufacturer); *Henke Enters. v. Hy–Vee Food Stores, Inc.*, 749 F.2d 488, 489–90 (8th Cir.1984) (concluding that owner of hardware store in shopping center lacked standing to bring antitrust action against owner of grocery store who anchored mall and upon vacating mall prohibited assignee from leasing property to another grocery store because hardware store was neither competitor nor consumer in the retail grocery market).

Plaintiffs submit that defendants conspired to have Jewel anchor Elk Crossing while preventing a major anchor tenant from taking over Jewel's rental space in order to block Mr. Serfecz's attempt to redevelop Grove Mall. The anticompetitive conduct about which the plaintiffs complain involves two separate activities—Jewel's move to Elk Crossing and Jewel's attempted sublease to United Skates and refusal to relinquish its leasehold interest. The defendants have provided evidence showing that Jewel's move to Elk Crossing is compatible with their legitimate business interests. Jewel argues that its move to Elk Crossing was based upon legitimate business concerns: Elk Crossing offered Jewel a new, updated, and larger space and the ability to open a companion Osco drugstore; Jewel could not operate a drugstore in Grove Mall because Walgreens possessed the exclusive right to operate a drugstore at Grove Mall. The Elk Crossing defendants argue that their interest in Jewel is based upon the desirability of Jewel/Osco as an anchor tenant for a neighborhood shopping center. Elk Crossing and Jewel therefore have proffered legitimate business reasons for Jewel's decision to move to Elk Crossing and for Elk Crossing's desire to have Jewel as a tenant.

Jewel's actions relating to its Grove Mall lease are more problematic. The plaintiffs argue that Jewel attempted to sublet to United Skates in order to destroy Grove Mall as a retail shopping center because a roller rink anchor tenant is inconsistent with that use. The plaintiffs contend that Jewel, knowing that the lease prohibited subleases that would increase insurance rates absent the owner's consent, initiated the state declaratory judgment action in order to discourage potential retailers interested in subleasing the space and to tie up the plaintiffs in litigation. Jewel counters that its attempted sublease to United Skates was based on its desire to earn rent on the vacant space; it makes no argument, however, with regard to the continued payment of rent for the vacant space. Moreover, Jewel's explanation does not offer any legitimate business justification for its failure to minimize its rental payments on vacant space by accepting Mr. Serfecz's offer to pay United Skates rent or to release

Jewel from the lease. Although this lack of explanation on Jewel's part may evidence an anticompetitive motivation on its part, it does not permit, by itself, an inference of a conspiracy on the part of Jewel with the owners of Elk Crossing. Absent some showing that Jewel has held onto its lease with Grove Mall because of an agreement with the Elk Crossing defendants, we cannot say that the record supports a violation of § 1 of the Sherman Act. We therefore turn to the remainder of the plaintiffs' contentions in order to determine if they have demonstrated that the record raises a genuine issue of triable fact as to an agreement between Jewel and Elk Crossing.

 We turn first to the evidence of motive. The plaintiffs argue that Jewel and the Elk Crossing defendants both had a compelling motive to destroy Grove Mall as a viable competitor. According to plaintiffs, the value of Elk Crossing is inflated because of a lack of alternate space and competitors. Therefore, the Elk Crossing owners have been able to charge high rental prices, obtain a multi-million dollar mortgage and permit the Elk Crossing partners to withdraw $7 million in excess value within two years after the mall was completed. The lack of competition also has permitted Jewel to reap the benefits of having a "captive population" because it is the only retail grocery store in the area. Both defendants certainly have a motive to pursue their respective economic objectives free of competition from a redeveloped Grove Mall. However, it is important to note that proof of motive is of limited utility in this context. Although a lack of motive may be evidence that parties did not conspire, the presence of an economic motive is of very little probative value. *See Matsushita*, 475 U.S. at 596–97, 106 S.Ct. at 1361 ("Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."). The mere existence of mutual economic advantage, by itself, does not tend to exclude the possibility of independent, legiti-

mate action and supplies no basis for inferring a conspiracy. *Riverview Inves., Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474, 483–84 (6th Cir.), *cert. denied*, 498 U.S. 855, 111 S.Ct. 151, 112 L.Ed.2d 117 (1990). We agree with the district court that the mere confluence of economic interests between the parties does not establish, standing alone, the existence of a conspiracy.

The plaintiffs next argue that defendants built Elk Crossing knowing that there would be no competition from Grove Mall. They presented testimony that one of the key concerns of a developer planning to build a shopping center is the presence of current or future competition. Kenneth Leonard, a real estate consultant, testified that he knew of no reputable, knowledgeable developer or chain store who did not consider the threat of competition a most important consideration when undertaking a development project. Neither Jewel nor the Elk Crossing defendants have produced evidence that a market analysis or feasibility study was conducted concerning possible future competition.[8] The Elk Crossing defendants argue that they had no incentive to do such a study or analysis and dispute the importance of conducting such studies. The failure of the Elk Crossing developers to take the precautionary step of undertaking a market study is not, in our view, sufficiently indicative in itself of an agreement to justify denial of summary judgment. This evidence could not support a jury finding of conspiracy between the Elk Crossing owners and Jewel. It raises, at best, the "metaphysical doubt" that *Matsushita*, 475 U.S. at 585, 106 S.Ct. at 1355, counsels is not sufficient to submit the issue to a jury. We agree with the district court that the fact that the defendants believed that Elk Crossing would be able to compete successfully with the less modern mall across

the street does not supply a basis for inferring a conspiracy.

Plaintiffs also point to two instances in which Patrick F. Daly and his architectural firm have engaged in "similar conduct" with Jewel in developing other shopping centers. The first is the Hickory Hills shopping center. In 1985, Patrick F. Daly & Associates, Inc. was employed as the architectural firm for the shopping center, and Mr. Daly had an ownership interest in the development. Prior to the development of Hickory Hills, Jewel was located across the street and when Jewel moved it obtained a restriction on its former leasehold location. The second instance is the Scharrington Square shopping center in Schaumburg, Illinois. Patrick F. Daly & Associates, Inc. was employed as the architectural firm and Mr. Daly had an ownership interest in the development.[9] Prior to the development of Scharrington Square, Jewel had been located in a nearby shopping center. Jewel obtained a restriction on the old leasehold location so that the premise could not be leased to any person or entity whose primary business was either the retail sale of food or prescription drugs.

The plaintiffs can point to no evidence showing Daly's involvement with Jewel's negotiations of the lease restrictions. The fact that Daly's architectural firm has worked on a number of shopping centers that are anchored by Jewel and that Daly has invested in these shopping centers create an inference of Daly's ability to attract business more than it creates an inference of a conspiracy.

The plaintiffs describe their theory of the case in these terms:

> [T]he Elk Crossing defendants have an ongoing relationship with Jewel. The Elk Crossing defendants build and own new shopping centers in locations where Jewel

---

8. Leonard testified that the documents that the defendants produced for review contained no information as to competition. In regard to the absence of documents relating to competition, Leonard testified that: "It is so strange that this one critical piece of information that everybody else in the world looks to as being vital, that they agonize endlessly over, nobody, two of the most sophisticated people around, supposedly didn't even mention it. You have a sophisticated development group and a sophisticated chain store

group, smart, very smart people, and they both like forgot, they had mental lapses." R. 221–22, Ex. 2 at 110–11.

9. Dalan/Jupiter, Inc. was the company responsible for the development of the shopping center. Neither party has given a clear description of Mr. Daly's relationship to Dalan/Jupiter, Inc. though both admit that he was an officer, owner, or shareholder.

has an old store nearby. Jewel moves into the new center and sterilizes the old location.

Appellants' Br. at 41. Plaintiffs have failed to connect Daly's actions with Jewel's actions, and neither set of actions, standing alone or in tandem, is evidence for inferring a conspiracy.

■ The evidence of record fails to show that, if the case were submitted to a trier of fact, there would be sufficient evidence to justify a judgment for the plaintiffs. Although, at the summary judgment stage, we must evaluate the record so as to give the nonmoving party the benefit of the doubt on all reasonable inferences that may be drawn from that record, we are not permitted to allow a case built on a metaphysical doubt to go to the jury. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356. Here the plaintiffs' case is built on a metaphysical doubt on a metaphysical doubt. There is simply no evidence that precludes the possibility of independent action. *Id.* at 597 n. 21, 106 S.Ct. at 1361 n. 21. In this context, the absence of that evidence deprives the plaintiffs of a reasonable case that would support a jury verdict. *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1000–01 (3d Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995); *see Eastman Kodak,* 504 U.S. at 468–77, 112 S.Ct. at 2083–87.

## B. *The Malicious Prosecution Claim*

■ In February 1990, Mr. Serfecz learned that Jewel was negotiating a sublease with United Skates, who wished to operate a roller skating rink on the premises. Mr. Serfecz wrote Jewel and explained his opposition to the sublease. He believed that, under the terms of the lease, Jewel could not sublease without prior written consent to any tenant whose operation would cause an increase in insurance rates. Jewel responded by stating that it believed that it had the right to sublet the premises as long as the proposed sublease was for a lawful purpose. It offered to reimburse Mr. Serfecz for any increase in the insurance premium. Mr. Serfecz changed the locks to the premises and

Jewel brought a declaratory judgment action against Mr. Serfecz in state court regarding its right to sublease to United Skates. The trial court granted Mr. Serfecz's motion for a directed verdict, and the Illinois appellate court affirmed. *Jewel Cos. v. Serfecz,* 223 Ill.App.3d 1106, 204 Ill.Dec. 63, 641 N.E.2d 22 (1991). On appeal before this court, plaintiffs maintain that the suit was brought solely for the purpose of harassment, intimidation, and interference with the redevelopment of Grove Mall, and they charged Jewel with malicious prosecution.

■ The Illinois courts have long disfavored actions for malicious prosecution and have sought to encourage a policy of open access to the courts. *Levin v. King,* 271 Ill.App.3d 728, 208 Ill.Dec. 186, 188, 648 N.E.2d 1108, 1110 (1995); *Keefe v. Aluminum Co. of Am.,* 166 Ill.App.3d 316, 116 Ill.Dec. 740, 741, 519 N.E.2d 955, 956 (1988). In order to establish malicious prosecution, a claimant must show that: (1) the action was terminated in plaintiff's favor; (2) the action was brought maliciously and without probable cause; and (3) the plaintiff suffered "special injury" or special damage beyond the usual expense, time or annoyance in defending a lawsuit. *Levin,* 208 Ill.Dec. at 188, 648 N.E.2d at 1110; *Keefe,* 116 Ill.Dec. at 741, 519 N.E.2d at 956. The district court determined that the plaintiffs were able to show that the declaratory judgment action was terminated in their favor. It also concluded that they had provided sufficient evidence to create a factual dispute as to whether the action was brought maliciously and without probable cause. However, according to the court, they were unable to show special injury. We agree.

■ Under Illinois common law, special injury is usually "identified with an arrest or seizure of property or some constructive taking or interference with the person or property." *Levin,* 208 Ill.Dec. at 188, 648 N.E.2d at 1110. "[A] showing of interference with property 'is satisfied only if a court issues a provisional remedy such as attachment, an order of arrest or an injunction.' " [10]

---

10. Plaintiffs argue that the temporary restraining order issued by the trial court created a special

injury identical to the issuance of a preliminary injunction barring a plaintiff from use of her

*Equity Assocs., Inc. v. Village of Northbrook,* 171 Ill.App.3d 115, 121 Ill.Dec. 71, 76, 524 N.E.2d 1119, 1124 (1988) (*quoting Tedeschi v. Smith, Barney, Harris, Upham & Co.,* 548 F.Supp. 1172, 1174 (S.D.N.Y.1982), *aff'd,* 757 F.2d 465 (2d Cir.), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985)). In Illinois, the court's focus rests upon the peculiar effect of the suit upon plaintiff's right to use the property; special injury in civil cases will not be found unless the injuries emanate directly from the impact of the issues allegedly wrongfully litigated. *Compare Bank of Lyons v. Schultz,* 78 Ill.2d 235, 35 Ill.Dec. 758, 399 N.E.2d 1286 (1980) (holding that injunction restraining distribution of life insurance proceeds for more than nine years to widowed beneficiary sufficient interference with property to satisfy special injury requirement) *and Norin v. Scheldt Mfg. Co.,* 297 Ill. 521, 130 N.E. 791 (1921) (concluding that prosecution of involuntary bankruptcy created basis for malicious prosecution claim because of the unusual and far reaching impact of a bankruptcy action on property rights) *with Keefe,* 116 Ill.Dec. at 742, 519 N.E.2d at 957 (determining that public record of unsatisfied judgment and impairment of credit rating as a result of pending litigation did not satisfy special injury requirement). The injuries that plaintiffs allege are lost rental payments and the devaluation and inability to redevelop Grove Mall. These allegations of damages are insufficient to satisfy the special injury requirement. Allegations of loss of potential tenants, of institutional lending commitments, and of the earnings and appreciation of a building complex are inadequate to satisfy the special injury requirement. *See Equity Assocs., Inc.,* 121 Ill.Dec. at 74, 524 N.E.2d at 1122.

**C. The Breach of Lease Claim**

Plaintiffs also allege that Jewel has breached paragraph 28 of the lease by using the premises solely for the purpose of keeping the anchor space dark. Paragraph 28 provides that the "lessee shall use the leased premise only for operation of a grocery supermarket." The plaintiffs state that "the gist of [our] argument concerning paragraph 28 is that Jewel is using the premises to stifle competition and not to operate a grocery supermarket." Reply Br. at 21. This argument is, at best, an extension of plaintiffs' argument that Jewel has breached the lease by using the premises for an unlawful purpose, a claim which is still pending in the district court.[11]

Paragraph 28 is a typical use-restriction provision delineating the permissible uses of the leased premises. We do not believe paragraph 28 supports plaintiff's claim that a use-restriction as to the sale of groceries restricts the defendants from leaving the store vacant. Allowing a store to remain vacant is different from opening a hardware or music store on the leased premises, and we believe it is the latter and not the former that paragraph 28 was meant to address.

### Conclusion

For the foregoing reasons, the decision of the district court is affirmed.

AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

This is a difficult case. Much of the relevant case law and the various guides to standing it contains may be read at least superficially to support the result reached by the majority. The alleged injury here is "indirect" in the sense that Serfecz is not a

property. We disagree. The temporary restraining order was issued after Serfecz changed the locks and simply gave Jewel, the legal tenant, access to and control of its leased premises.

11. In the district court, plaintiffs claimed that Jewel breached paragraph 1 of the lease by using the premise to restrain trade and monopolize the retail grocery business. Paragraph 1 of the Jewel lease provides:
Lessee shall not use the demised premise for any unlawful purpose nor shall it commit waste. It shall comply with all lawful requirements of the local Board of Health, Police and Fire Departments, and state and federal authorities, respecting the manner in which it uses the leased premises.
R. 22, Ex. 7 at 1. The district court found that use of the premises in furtherance of a § 2 antitrust violation could constitute a breach of the lease and denied defendant's motion for summary judgment as to this claim.

competitor in the retail grocery market nor, obviously, a consumer. Yet the economic reality is that Serfecz has suffered a more calculable and a more substantial injury from Jewel's allegedly anti-competitive conduct than would a plaintiff whose injuries were in theory direct. In fact, if Serfecz's suit fails for lack of standing, there is not much realistic hope of anyone else's taking up the cudgels. This is certainly a relevant, though not necessarily dispositive, factor in the analysis.

It is unlikely that a grocery store competitor (or here *potential* competitor) of Jewel would challenge Jewel's conduct in retaining its hold on its abandoned store. With all the thousands of possible locations available in the Chicago area, it is doubtful that a competitor would undertake an expensive and prolonged lawsuit to gain entry to one of them—and one already subject to Jewel's strong competition, at that. This would be true even if, as is alleged here, Jewel played dog in the manger with other store locations as well.

A customer would be even more unlikely to sue since her damages would be slight and very difficult to prove. On the other hand, Serfecz has lost his anchor tenant and been precluded from getting another. The consequent decline in the value of his shopping center involves not only a substantial loss but one more easily calculable than losses to potential competitors or to consumers. Serfecz may be in theory only a supplier to a potential competitor but his evident loss is much more likely to be the basis of a lawsuit than the putative loss of one "directly" injured.

Judge Grady, whose summary judgment decision we review here, expressed doubt and frustration about the result to which he felt driven by the cases. He expressed the view that competitors of Jewel or its consumers would not in fact be in a position to challenge the alleged anticompetitive conduct here. Judge Grady expressed his concerns as follows:

Is there an identifiable class of potential plaintiffs who might be better suited than Serfecz by virtue of their more direct injuries to bring suit and whose self-interest would motivate them to do so? In the case

most directly on point, *Southaven*, the Sixth Circuit rather summarily concluded that consumers or other market participants would be more appropriate plaintiffs to seek a remedy for restraint of trade or monopolization in the grocery market. While, in theory, we agree with the Sixth Circuit, we lack that court's confidence that either of these two groups of potential plaintiffs would be sufficiently motivated to actually bring suit. We suggest that Serfecz might be correct that a competing grocery store not yet operating in the area, such as Dominicks, would be more likely to forgo a location than to incur the high start-up costs of litigation. Indeed, according to plaintiffs, the fact is that no competitor has filed an antitrust lawsuit against Jewel although there is evidence that Jewel has been restricting locations throughout Illinois for the last ten years. As regards a consumer suit, the degree of harm suffered by an individual consumer as a result of reduced competition in the grocery market in Elk Grove Village would probably not be sufficiently great to give him incentive to sue. Thus, we fear that there is a high risk that a significant antitrust violation will go unremedied if we do not grant plaintiffs standing to sue in this case. Mem.Op. at pp. 602–03.

Admittedly, the prospect of there being no enforcement of the antitrust laws here if the present suit fails is not dispositive, but it should weigh significantly in the scales. "An antitrust standing determination is ultimately a product of the particularities of each case." *Sanner v. Board of Trade*, 62 F.3d 918, 927 (7th Cir.1995). "*McCready* and *Associated General Contractors* exemplify that innumerable elements, including proximity and directness, constitute proper areas of inquiry" in determining antitrust standing. *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir.1983). This case is a far cry from *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), where the injury to the plaintiff union was far more speculative than any injury to landowners (customers) and other contractors (competitors) to whom

coercion was applied in that case. Certainly these landowners and other contractors could readily have sued had they in fact been injured. That is not the case here.

I believe that this case is distinguishable from much of the precedent because Jewel as an anchor tenant in a shopping center occupies a dual role. It is no doubt a competitor in the retail grocery market. But it (or its replacement if one is permitted) is also an essential ingredient of a successful shopping center. Jewel's refusal to permit competition is therefore in and of itself a fatal blow to the viability of the center. The issue is whether Serfecz has "antitrust" standing and I am persuaded that he does in these limited circumstances—even though the injury to him is indirect. *Cf. Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994).

*Southaven Land Co.*, cited by the majority, is factually on point but reaches a result opposite to the one I advocate here. However, that case conceded that, "a finding or concession that [the lessor] is not a direct participant in the relevant market is not dispositive of the § 4 'standing' issue." 715 F.2d at 1086. The Sixth Circuit went on to conclude that the injury to the lessor of grocery store facilities was not "inextricably intertwined" with the injury to the retail grocery market so as to make the analysis in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), controlling. I think the analysis of the Sixth Circuit up to, but not including, its final step is correct. I disagree, however, on the question whether the injury to the retail grocery market here is inextricably intertwined with the injury to Serfecz and the Grove Mall. If, as is alleged, Jewel retained its lease on the empty store in the Grove Mall with intent to monopolize the retail grocery business in the area, it is difficult to see how damage to the Mall would not have been foreseeable and inevitable. Therefore, I believe that the one injury is inextricably intertwined with the other. Injury to the Mall is surely more calculable than injury to a potential competitor not yet present in the market. *Cf. Hoopes v. Union Oil Co.*, 374 F.2d 480 (9th Cir.1967).

In the case before us, Judge Grady found: Without elaborating in any detail, we believe that plaintiffs in the present case have presented enough evidence for the trier of fact to find a causal connection between the absence of a grocery store anchor tenant and the slow demise of the Grove Mall. There is also evidence that Jewel acted deliberately to prevent a competitor from occupying the space in the Mall. Mem.Op. at 7.

It is also true that there is no problem of duplicative recovery here because Serfecz presumably could recover the loss in value of his shopping center due to his inability to redevelop it, as well as lost rental income. A potential competitor, on the other hand, could recover the unrelated amount of lost profits, and a consumer could recover damages due to higher prices. On balance, therefore, I believe that Serfecz has antitrust standing and should be allowed to proceed.

I therefore respectfully dissent.