AMBRO, Circuit Judge,
dissenting in part and concurring in part.
I respectfully disagree with my colleagues’ view that Hanover 3201 Realty has suffered antitrust injury, a necessary component of antitrust standing. In my view, because the anticompetitive effects of Village Supermarkets’ actions (as opposed to the damages sustained directly from any tort) do not hurt Hanover, a landlord and not a player in the market for full-service supermarkets, it lacks antitrust standing to bring this suit.
However, I recognize that my colleagues’ view of antitrust standing is, by virtue of their ruling, the holding of our Court and now the law of this Circuit. In this context, I believe I am obliged to consider the merits of Hanover’s suit. Among other things, I agree with Judge Fuentes that Village’s Noerr-Pennington immunity defense is a sham and hence unavailing at this stage. Thus I vote to vacate the judgment of the District Court and remand.
This sets the stage for a most interesting interplay of whether to vote by issue (in which case Hanover wins, as, while I lose on the issue of standing, I align with Judge Fuentes on the lack of merit for Village’s claim of immunity under Noerr-Pennington ) or outcome (whereby Village wins, as my outcome, though for different reasons, aligns with Judge Greenberg’s). I opt for the former for the reasons noted below.
I. Hanover Lacks Antitrust Standing

A. Law of Antitrust Injury

In order to state a claim for violation of the antitrust laws, a plaintiff must show that it has suffered “antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defen *185 dants’ acts unlawful.” Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Antitrust injury is a necessary but not sufficient component of antitrust standing, a prudential limitation on the Clayton Act’s broad language concerning the right to sue. Barton & Pittinos, Inc. v. Smith-Kline Beecham Corp., 118 F.3d 178, 182 (3d Cir.1997).
We have held that a plaintiff ordinarily does not suffer “antitrust injury” if it is “not a competitor or a consumer in the market allegedly restrained,” id. at 181, unless “there exists a ‘significant causal connection’ such that the harm to the plaintiff ... [is] ‘inextricably intertwined’ with the antitrust conspiracy,” Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir.1993) (quoting Blue Shield v. McCready, 457 U.S. 465, 484, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)). This exception is narrow, and antitrust injury is “almost exclusively suffered by consumers or competitors.” Steamfitters Local Union No. 120 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 926 (3d Cir.1999).[1]
My principal disagreement with my colleagues concerns how to read the “inextricably intertwined” exception. As I understand their opinion, they hew closely to the meaning of those two particular words and believe that a plaintiff has suffered an antitrust injury if its injury is closely related to a defendant’s actions that also amount to an antitrust violation. By contrast, I believe the rule remains that “antitrust injury should reflect the anticompeti-tive effect either of the violation or of anticompetitive acts made possible by the violation.” Brunswick, 429 U.S. at 489, 97 S.Ct. 690. In my view, even if a plaintiff has suffered direct harm from a defendant’s acts, and even if those acts violate the antitrust laws, it has not suffered antitrust injury unless its own harm stems from the anticompetitive consequences of the defendant’s conduct.
As the majority notes, the “inextricably intertwined” language comes from the Supreme Court’s decision in McCready, a case with exceptionally broad dicta about antitrust standing. In that case, the plaintiff, who was insured by Blue Shield, saw a psychologist. McCready, 457 U.S. at 468, 102 S.Ct. 2540. Blue Shield allegedly colluded with psychiatrists to divert patients like McCready from psychologists by declining to reimburse the latter’s services. Id. at 469-70, 102 S.Ct. 2540. It argued that McCready had not suffered antitrust injury because neither psychiatrists’ nor psychologists’ prices increased as a result of its scheme (ignoring tjie de facto price increase of the insurance company’s failure to reimburse the insured), id. at 481-84, 102 S.Ct. 2540, and that the point of the alleged scheme was to harm psychologists, not their insured patients, id. at 478-79, 102 S.Ct. 2540.[2] But the Supreme Court *186 held that “[although McCready was not a competitor of the conspirators [psychiatrists and Blue Shield], the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market.” 457 U.S. at 483-84, 102 S.Ct. 2540.
The reason McCready’s injury was inextricably intertwined with the harm inflicted on the psychotherapy market was that she was a consumer in that market and her “injuries [were] the essential means by which defendants’ illegal conduct brought about its ultimate injury to the marketplace.” Ethypharm S.A France v. Abbott Labs., 707 F.3d 223, 237 n. 21 (3d Cir.2013) (quoting IIA Philip E. Areeda, et al., Antitrust Law ¶ 339, at 123 (3d ed.2007)). However, the term “essential means” does not mean that anyone who suffers any injury in the context of an anticompetitive scheme may sue under the antitrust laws. In McCready, although the plaintiff was not the ultimate target of the cartel’s activity, Blue Shield and the psychiatrists used a classic antitrust harm — increased prices — as a fulcrum to distort the psychotherapy market, specifically to the detriment of psychologists. The McCready Court affirmed that a person who suffers antitrust injury---! e., who is injured because of the anticompetitive effects of a cartel or monopolist’s activity — may bring suit even if that person is not a consumer from whom the defendant seeks to extract supracompetitive rents or a competitor the defendant seeks to eliminate. See IIA Ar-eeda, supra, ¶ 339, at 144 (4th ed. 2014) (“[T]he result of the alleged antitrust conspiracy would be higher prices in the very market in which McCready was a purchaser.... McCready is thus like a purchaser from a cartel at cartel prices.”).

B. Hanover Has Not Suffered Antitrust Injury

Here, Hanover alleges monopolization of two markets, one for “full service supermarkets,” and one for “full service supermarket shopping centers,” the latter defined as the market for real property that can be used for full-service supermarkets. It does not participate in the supermarket business; it is a landlord and developer. It operates a development enterprise in the real-estate market, but it does not sell goods or provide consumer services the way Village does. And although Hanover does participate in the market for real property that can be used for full-service supermarkets, Village’s actions have not affected that market. In other words, Hanover does not participate in the market that was allegedly restrained, and the market it does participate in was not restrained. Hanover has thus not suffered an antitrust injury.
1. Full-service Supermarket Market
Unlike the relationship in McCready between the plaintiff and the market for psychotherapy services, whether the market for full-service supermarkets is ultimately restrained does not matter to Hanover. Its injuries flow from Village’s alleged wrongful use of civil proceedings and from Hanover’s contract with Weg-mans that allocated to Hanover some portion of the risk of failing to develop the parcel within a certain period of time. Village’s alleged attempted monopolization of the relevant markets hurts Wegmans, a full-service supermarket, and it hurts consumers who would prefer a choice among supermarkets, but as Village is not alleged to have restrained the market for real estate in Morristown or anywhere else, it is hard to see why Hanover is a proper antitrust plaintiff even if it has valid tort claims arising out of otherwise anticompetitive conduct. In short, because the anticompetitive effects of Village’s allegedly illegal activity have not *187 caused any injury to Hanover, it does not have an antitrust claim.
Several sources of authority support the notion that a landlord is an improper antitrust plaintiff when it complains of injury flowing from antitrust harm directed at a tenant. The leading treatise deals with the situation in one terse paragraph: “The landlord receiving a set rather than variable rent is simply a supplier of an input. ... Such landlords are almost always denied standing for antitrust violations that target their tenants or that occur in the product market.” IIA Areeda, supra, ¶ 351c, at 286. We have also disposed of claims brought by landlords without much analysis beyond indicating that any injury the landlord suffered, even when its rent was tied to the tenant’s revenue, was too remote from the antitrust violation to allow the landlord to bring suit.
[A] non-operating lessor-owner of a motion picture theatre who is entitled to rental based on a percentage of receipts is nonetheless not a “person ... injured in his business or property” within the meaning of section 4 of the Clayton Act, 15 U.S.C. § 15, and, therefore, is not entitled to bring suit under the Act for an alleged conspiracy relating to the licensing of pictures at the theatre by the lessee-operator.
Melrose Realty Co. v. Loew’s, Inc., 234 F.2d 518, 519 (3d Cir.1956) (per curiam); see also Harrison v. Paramount Pictures, Inc., 211 F.2d 405, 405 (3d Cir.1954) (affirming for the reasons stated in the District Court’s opinion, see 115 F.Supp. 312 (E.D.Pa.1953), which held that a movie theater lessor was too remote from antitrust harm directed at movie distributors). More recently, we held that “[a] supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services.” W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 102 (3d Cir.2010). And a landlord is in the same shoes as a supplier from an antitrust-injury perspective. IIA Areeda, supra, ¶ 351c at 286.
Other courts of appeals that have faced facts similar to our case have rejected the landlord’s standing. Most closely on point is Serfecz v. Jewel Food Stores, 67 F.3d 591 (7th Cir.1995), where owners and operators of a shopping mall sought to recover damages from an anchor tenant, a grocery store. The tenant opened another store nearby, vacated its old premises, and would not sublease them to another grocery store. The Seventh Circuit Court held that the “plaintiffs d[id] not have the requisite direct injury to have standing to assert that [the defendant] ha[d] monopolized, or conspired with others to monopolize, the retail grocery market,” id. at 598-99, because plaintiffs were players in the shopping center market, not the retail grocery business.
Similarly, in a Sixth Circuit case a grocery store subleased to a competitor grocery store and then engaged in anticom-petitive conduct to ruin it. Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1081 (6th Cir.1983). The plaintiff, a landlord that owned the rest of the shopping center of which the grocery store was a part, found a replacement grocery store, but the defendant would not sublease to it, presumably lowering the value of the shopping center. The Court noted that “Southaven’s [the land owner’s] injury [was] charged to have accrued as a result of its contract negotiations with the alleged antitrust violator. The complaint noticeably failfed] to aver that Southaven sustained any injury as a competitor, purchaser, consumer or other economic actor in the grocery industry.” Id. at 1081. Ultimately, the Court held that as “Southaven is not a consumer, customer, competitor or participant in the relevant market or oth *188 erwise inextricably intertwined with any such entity[, i]ts injury [was] not sufficiently linked to the pro-competitive policy of the antitrust laws” to confer standing on it. Id. at 1087; accord Rosenberg v. Cleary, Gottlieb, Steen & Hamilton, 598 F.Supp. 642, 645-46 (S.D.N.Y.1984) (“No matter how causal a relationship may exist between the alleged violation and injury, the defendants’ actions were not undertaken to interfere with the economic freedom of participants in the construction business.”).
Because I read the Supreme Court’s and our eases on antitrust standing to require a plaintiffs harm to be at least “inextricably intertwined” with whatever makes a defendant’s conduct specifically an antitrust violation — e.g., higher prices or reduced output — I believe Hanover lacks standing with respect to the allegedly unlawful restraint of the full-service supermarket market. Hence I respectfully dissent from the decision of my colleagues to reverse on this issue.
2. Full-Service Supermarket Shopping Center Market
Hanover also alleges that it competes directly with H & H, the special purpose entity that owns the land for Village’s supermarket, in the “full service supermarket shopping center market” of greater Morristown. This title for the market, besides being a mouthful, is confusing, as the market players are said to be landowners “whose property is or can be utilized by or rented to a full-service supermarket.” Am. Compl. ¶ 32, J.A. 69. Thus the market is for certain real property. The Serfecz plaintiffs, who lacked standing insofar as they alleged monopolization of the retail grocery market, nevertheless had standing with respect to the shopping center market. 67 F.3d at 599. This was because they had ownership interests in a mall, and the defendant (a former anchor tenant and grocery store) allegedly colluded with a different shopping center to drive Serfecz’s mall out of business. Id. at 595, 599. Hanover argues that H & H and Village are trying to keep Hanover out of the full-service supermarket shopping center market in the same way that the Ser-fecz defendants allegedly drove the plaintiffs out of the mall business.
Unlike the plaintiffs in Serfecz, neither Hanover nor H & H is specifically in the business of operating shopping centers. Instead, they are owners and developers of real property. Hanover does not allege, for example, that its parcel’s value decreased following Village and H & H’s attempts to exclude competitors from the market for owning land on which supermarkets can be leased. And the Complaint does not allege that Village’s efforts have affected the market for real property in Morristown or anywhere else to any significant degree. As Hanover has not plausibly alleged that Village’s monopolistic conduct has injured it as a landowner, it cannot be said that the frustration of its contract with Wegmans “reflect[s] the anticompetitive effect ... of the violation.” Brunswick, 429 U.S. at 489, 97 S.Ct. 690; cf. IIA Areeda, supra, ¶ 351b1, at 284 (“In the movies cases, for example, the defendant’s conduct ... depriv[ed] rival film producers, distributors, or exhibitors of adequate access to markets or supplies. The landlord is a stranger to those interests: the real estate market as a whole is not significantly affected.”).
Thus, and for the reasons ably expressed in Part II.A.2 of Judge Fuentes’ opinion, I agree that Hanover lacks antitrust standing with respect to wjhat it calls the full-service supermarket shopping center market.
II. Noerr — Pennington and Remaining Issues
I agree with Judge Fuentes’ views on Noerr — Pennington and Village’s other *189 objections to Hanover’s Complaint. Hence I join Part II.B-C of his opinion.
III. How to Decide This Case?
This case presents what academic literature terms a “voting paradox.” On the one hand, two judges (Judge Greenberg and I) believe that the outcome should be that Hanover’s suit not proceed, though we do so for different reasons. However, one majority of this Court (Judges Fuentes and Greenberg) believes that Hanover has antitrust standing (I do not because I do not discern antitrust injury), while another majority (Judge Fuentes and I) believes that Hanover should survive Village’s motion to dismiss (assuming it has antitrust standing). The paradox is that, if I vote on the judgment of this case (affirm or reverse) based on my individual views, a majority of the Court will have ruled against the prevailing party on each relevant issue, meaning that our Court’s reasoning would not support its judgment. However, if I follow, despite my dissent, Judge Fuentes and Greenberg on the antitrust standing issue, my individual vote would be inconsistent with my view of who should win were I alone ruling.
But to me it is significant that we are not acting alone. Because we need to act as a Court, I think it is more appropriate for me to be bound by the-majority’s opinion on antitrust standing despite my disagreement with it. Before I explain my choice in detail, I shall survey the current state of thinking on this issue.

A. Law and Scholarship on the Voting Paradox

Although I do not write on an entirely blank slate with respect to this issue, there is surprisingly little discussion in judicial opinions about how one ought to vote when facing such a paradox. Where a majority agrees on the bottom-line outcome in a case, shifting majorities with varied lines of reasoning are more common; these variable groups unquestionably describe the holdings of the relevant courts. See, e.g., United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (resolving whether there was a constitutional violation by one majority per Justice Stevens over Justice Breyer’s dissent but ordering remedy via a different majority per Justice Breyer over Justice Stevens’ dissent); Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 302 (3d Cir.2014) (“Although a majority of the Court thus does not accept the District Court’s ruling that CBP did not have standing, this conclusion does not change our outcome in light of a different majority’s independent conclusion that the Court properly entered summary judgment against the plaintiffs.”); United States v. Aguila-Montes de Oca, 655 F.3d 915, 916 (9th Cir.2011); O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973 (10th Cir.2004) (en banc); United States v. Johnson, 256 F.3d 895, 897 (9th Cir.2001) (en banc); Davis v. U.S. Steel Corp., 779 F.2d 209, 210 (4th Cir.1985).
It is thus commonplace that majorities composed of different allotments of judges lay down the law, and it would seem to follow that a judge may vote on a judgment based on the relevant court’s legal conclusions even if the judge disagrees with the court’s resolution of a dispositive issue. However, it is quite rare that judges are actually faced with a voting paradox where it is debatable whether the proper result is to vote according to the judge’s personal preference or to vote according to shifting majorities’ statements of the law. In three Supreme Court cases, justices have noted that their votes on the judgment were inconsistent with their individual views of the proper outcome of the case. Arizona v. Fulminante, 499 U.S. *190 279, 313, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (Kennedy, J., concurring in the judgment); Pennsylvania v. Union Gas Co., 491 U.S. 1, 45, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (White, J., concurring in the judgment in part and dissenting in part); United States v. Vuitch, 402 U.S. 62, 96, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971) (Harlan, J., dissenting as to jurisdiction); id. at 97, 91 S.Ct. 1294 (opinion of Black-mun, J.).
Fulminante and Vuitch are especially relevant.' In the former case, the Arizona Supreme Court held that a confession was coerced and thus inadmissible. State v. Fulminante, 161 Ariz. 237, 778 P.2d 602, 627 (1988), aff'd, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In deciding whether to affirm or reverse, the U.S. Supreme Court faced three issues: (1) whether the defendant’s confession was coerced; (2) if so, whether harmless error analysis applied; and (3) if so, whether the admission of the confession was harmless error. Fulminante, 499 U.S. at 279, 282, 295, 111 S.Ct. 1246. Five justices concluded the confession was coerced, id. at 287, 111 S.Ct. 1246; a different group of five justices concluded harmless error applies to coerced confessions, id. at 311-12, 111 S.Ct. 1246; and still a third group of five held that the admission there was not harmless, id. at 302, 111 S.Ct. 1246. At the same time, five justices thought the Arizona Supreme Court should have been reversed, though for no consistent reason. See id. at 306, 111 S.Ct. 1246 (opinion of Rehnquist, C.J., that confession was not coerced, joined by O’Connor, Kennedy & Souter, JJ.); id. at 312, 111 S.Ct. 1246 (opinion of Rehnquist, C.J., joined by Sca-lia, J., that admission of confession was harmless). Justice Kennedy yielded to the majority on the question of whether the confession was coerced and thus reached the harmless-error issue; he concluded the admission was not harmless and thus supported the judgment affirming the Arizona Supreme Court. Id. at 313-14, 111 S.Ct. 1246. Likewise, in Vuitch Justices Harlan and Blackmun acceded to a majority's disposition as to jurisdiction, but — together with other justices — formed a separate majority on the merits. 402 U.S. at 96, 97, 91 S.Ct. 1294.[3]
Similarly, in the panel opinion of United States v. Andis, 277 F.3d 984, 985 (8th Cir.2002), rev’d, 333 F.3d 886 (8th Cir.2003) (en banc), two judges held that the right to appeal an illegal sentence could not be waived, but a different majority •held that the sentence should be vacated. Two judges, acting independently, would have affirmed the sentence — one because *191 he viewed the waiver as valid and another because he thought the sentence was legal. Id. However, the judge who viewed the waiver as valid voted to remand the case for further proceedings because on the merits, assuming the issue was not waived, he believed the sentence was illegal. Id. at 989 (Morris Sheppard Arnold, J., dissenting in part and concurring in the judgment). This vote was made without much comment except that “otherwise the court could not issue a mandate.” Id. (In fact, a mandate could have just as easily issued if the two judges preferring affirmance voted to affirm.)[4]
At the same time, there have been cases where judges or justices stick to their individual guns with the result that, although a majority supports a given judgment, a careful reading of all the opinions in the case reveals that no majority supports the prevailing party on any issue logically necessary to its victory. For example, Miller v. Albright, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998), presented four questions, and shifting majorities of the Supreme Court sided with Miller on each one; nonetheless six justices, for differing reasons, thought Miller should lose, which she did. Maxwell L. Stearns, Should Justices Ever Switch Votes? Miller v. Albright in Social Choice Perspective, 7 Sup.Ct. Econ. Rev. 87, 102 (1999). To . muddy the waters further, scholars believe that in other cases justices or judges have cast votes in favor of analy-ses with which they did not agree in order to mask voting paradoxes. See, e.g., Michael Abramowicz & Maxwell L. Stearns, Beyond Counting Votes: The Political Economy of Bush v. Gore, 54 Vand. L.Rev. 1849,1938-41 (2001).
Given this array of paradoxical (or potentially so) cases and the striking absence of analysis of how to vote in any of them, it is not surprising that there is no set rule on how an appellate judge should vote. Generally, scholars who analyze voting paradoxes (and there are several) discuss two possibilities: “issue voting” and “outcome voting.” Broadly speaking, the for-' mer occurs when a judge surveys the holding on each question of law presented; a majority vote on any given issue counts as a holding of the court, and the remaining judge is bound by it as if it occurred in a prior precedential case.[5] The latter, and more common, scenario occurs when a judge votes on the result of a case (affirm, vacate, reverse, etc.) according to his or her view of the proper outcome and without regard to the views of the other judges on a panel. Even if a careful reading of the judges’ opinions in a case shows that a majority would rule for the losing party on *192 each relevant issue, an outcome-vote, as that term is usually used in the relevant literature, results in a win for the party the majority of judges think should win regardless of reasoning.
Before discussing the pros and cons of each voting protocol, I note that one thing is clear: as a formal matter, judges vote on the result of a case, ie., whether to affirm, reverse, vacate, dismiss, remand, or some combination of these; otherwise, the clerk of a court could not enter judgment pursuant to Fed. R.App. P. 36. But even though “result” and “outcome” are synonyms, it does not follow that my vote on the disposition must be what I have just defined as an “outcome vote.” I am aware of no source of law that tells me whether my vote must be based on how I view our Court’s holding on each relevant issue or on how I personally view the best outcome of the case.

B. An Issue Vote is Preferable Here

There are two closely related reasons why I choose to vote by issue in this case, and I will discuss them in turn: (1) the execution of our dual responsibilities to resolve disputes and declare the law; and (2) the role of a judge on a multimember court.
1. Our Dual Responsibilities: Dispute Resolution and Law Declaration
Those who sit on, appear before, or study federal courts are familiar with the notion that we serve two primary functions: dispute resolution and law declaration. The former role is rooted in the limitation that courts only decide “cases” and “controversies.” U.S. Const., art. Ill, § 2. To carry out this role, a court issues judgments in the cases before it; in the case of an appellate court, the judgment, as noted, will usually be to affirm, reverse, vacate, dismiss, remand, or some combination thereof.
A court’s second role is “to say what the law is.” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). This role flows directly from the first. “Those who apply the rule to particular cases ... must of necessity expound and interpret that rule.” Id. To fulfill its law-declaration function, a court often writes opinions explaining the law and reasoning underlying its judgments. See also Jonathan Remy Nash, A Context-Sensitive Voting Protocol Paradigm for Multimember Courts, 56 Stan. L.Rev. 75, 86-87 (2003) (“Courts function as arbiters of particular disputes between litigants. Those litigants are concerned with the outcome of the case as determined by the courts. But, in handing down decisions, courts serve another important role: They announce (or aid in the evolution and development of) generally applicable rules of law.”).
To me, issue voting better accomplishes both roles by deciding all necessary (including threshold) issues and proceeding from that point to explain what the law is and why. By voting on issues, a multi-member court announces discrete holdings that can be applied in later cases.
There is thus an obvious reason to vote on a case’s disposition based on the Court’s resolution of each relevant issue — to align rationale and outcome. A related reason to do so is that voting paradoxes often arise because of the operation of the final-judgment rule. Nash, supra, at 84-85. Because legal rulings are usually not ap-pealable before final judgments in most jurisdictions, appeals are more likely to present multiple issues that can create paradoxes, whereas if we heard appeals piecemeal, far less opportunity for voting problems would arise. The final-judgment rule is sound because it supports efficient resolution of cases at little cost: claims of *193 reversible error can be preserved and, as a general matter, the litigant who is right on the law will prevail.
But that is not true if we allow the final judgment rule to affect our substantive resolution of the issues in a case. Take this case. Imagine that the final-judgment rule did not apply, and Hanover prevailed on antitrust standing in the District Court. Village then appealed, and we affirmed (over my dissent). Then, on remand, Village prevailed on the Noerr-Pennington issue in the District Court, and Hanover appealed and won (over Judge Greenberg’s dissent). There would be no doubt in that case that Hanover would have properly won its appeals even though two judges thought at different phases of the litigation it should have lost, and no justification for the final-judgment rule requires a contrary bottom-line outcome in such a seriatim case. To generalize from that example, the final-judgment rule helps create the voting paradox without providing a satisfactory rationale for the usual practice of outcome voting, thus posing the question of why, other than habit, we typically vote by outcome.
Judge Greenberg points out that we could avoid the voting paradox if I didn’t bother to reach the Noerr-Pennington issue. If so, a majority would conclude that Hanover had standing, and then a majority would conclude that Hanover loses but without a majority supporting any particular reason for its loss. This avoids the problem of an incoherent precedent but replaces it with no opinion to provide even the hint of a rationale. Arguably, no reasoning is an improvement over reasoning that contradicts a judgment, but, as Judge Greenberg notes, we never have to issue an opinion. We could just issue judgment orders without reasoning in every case and save everyone a lot of time and paper. In my view, we issue judgments accompanied by reasoned opinions because the rule of law ought neither to be nor appear to be arbitrary. It follows that judgments should be supported by reasoning, that the reasoning should actually support the outcome in a particular case, and that in this case I should yield to my colleagues on antitrust standing and vote on the Noerr-Pennington issue that follows.
2. A Multimember Court: Deliberative Body or so Many Noses to Count?
The possibilities of issue and outcome voting expose a tension between the independence of individual judges and our membership on multimember panels of multimember courts. As we are independent, it could be thought that a litigant is entitled to the sum of independent votes in its favor and that a judge should not change his or her vote out of deference to colleagues’ shared views. The widely (though not universally) accepted practice of writing separate opinions when a judge disagrees with another’s analysis supports this view of voting one’s views alone.
There are at least two reasons why appellate courts should be deemed to act as an entity reasoning through the case issue by issue rather than a collection of individual judges with a judgment reflecting a vote tally divorced from the reasoning of the majority of the court. The first is the nature of multimember appellate courts as collegial, and not just redundant, enterprises. Kornhauser and Sager explain that redundant and collegial enterprises “aim to produce performances that could in principle represent the unenhanced ef-' fort of a single person, but to bring that performance closer to the ideal.” Lewis A. Kornhauser & Lawrence G. Sager, The One and the Many: Adjudication in Collegial Courts, 81 Calif. L.Rev. 1, 4 (1993). Redundant enterprises “rely on an external structure of multiple independent ef *194 forts.” Id. For example, in the case of gymnastics judges, “[e]ach judge ranks the performance before her without consulting her peers, and the rankings are aggregated by rule.” Id. By contrast, collegial bodies “are like team enterprises in that each participant must consider and respond to her colleagues as she performs her tasks. Collaboration and deliberation are the trademarks of collegial enterprise.” Id. “While interaction and exchange are irrelevant or even antithetical to redundant enterprises, they are crucial to collegial enterprises, and the product of a collegial enterprise often belongs to that enterprise in a uniquely collective way.” Id. at 4-5.
Appellate courts are collegial enterprises. Judges collaborate on and deliberate about cases and issues at all levels of the appeals process, from deciding whether to hold oral argument to conferencing to circulating opinions. At the end of the process a judgment of the Court typically emerges supported by an opinion. In some sense that product is akin to what a team produces. “Team enterprises do not merely multiply product or amplify effort: they transform the performance into something that only a group could have produced.” Id. at 3. Put another way, while an individual judge could do the job of an appellate court, the process of multimem-ber panels produces a product that is typically better qualitatively than what an individual appellate judge could do. The whole is greater than the sum of its parts.[6]
In some cases, then, outcome voting lessens the value of an appellate court’s deliberative process. If judges engage in issue voting, there are multiple deliberations and votes; that is, there are deliberations and votes on each issue. A judge is not effectively on the sideline for disagreeing with the majority on a threshold issue. Applying issue voting in this case, for example, I reach the Noerr-Pennington issue, even though I perceive no standing, because my individual view on the antitrust standing question is subsumed (despite my filing a dissent) into that of the panel; we act as a single deliberative body in a process that produces a judgment that depends on the majority’s reasoning (whatever the composition of that majority) at each step of the process. With outcome voting, by contrast, though judges deliberate on separate issues (unless they decide not to reach them), a judgment depends not on reasoning but a tallying of who should win were each judge to vote a result without reasons. There is, therefore, less of an opportunity for synthesis or transformation of each judge’s reasoning into the larger whole. This provides the answer to Judge Greenberg’s lack of “understand[ing] why the circumstance that we are all on the panel should lead to a different result than that which would be reached individually by a majority of the panel.” Greenberg Op. at 29. The result should be different because we sit on a panel.
Second, issue voting treats judges as interchangeable — the premise of the black robe and an assumption on which our legal system is based. In our case, for example, Hanover prevails because two out of three judges find antitrust standing for the plaintiff and two out of three judges find no immunity for the defendant. Voting by issue better reflects our role as members of a single deliberative body striving to craft a sensible corpus juris. As noted above, if we voted by outcome, the prece-dential value of this case would be unclear *195 if the same set of facts came before us (or a district court) a second time. For a body like a court that has no means to enforce its mandate other than persuasion, it is of great concern that “in cases where the doctrinal paradox arises, judgment and reason are immediately and inexorably pulled apart, to the potential detriment of the orderly development of legal doctrine.” Kornhauser & Sager, supra, at 5.

C. Arguments to the Contrary are Not Persuasive.

Thoughtful proponents of an outcome-based voting protocol argue that it promotes principled (i.e., not strategic) identification of issues and, at least in some cases, also promotes principled resolution of those issues. See Abramowicz & Stearns, supra, at 56-58; John M. Rogers, “Issue Voting” by Multimember Appellate Courts: A Response to Some Radical Proposals, 49 Vand. L.Rev. 997, 1002 (1996); Maxwell L. Stearns, How Outcome Voting Promotes Principled Issue Identification: A Reply to Professor John Rogers and Others, 49 Vand. L.Rev. 1045, 1050 (1996). In short, these scholars argue that if appellate courts vote by issue, judges and litigants will have an incentive to identify and sequence legal issues in disingenuous ways to cobble together shifting majorities that will eventually support their favored positions. By contrast, if the only vote is on the outcome, each judge will present the issues in the case as he or she actually views them without regard to the potential gains from gamesmanship in framing issues.[7]
There are a number of replies to this argument. First, professional norms of the bench and bar go a long way in preventing deceptive strategies in brief-and opinion-writing. Second, it is unclear to me that the resolution of issues in an outcome-vote is more principled than in an issue vote; indeed, a principal problem with outcome voting is that occasionally issues are left entirely unresolved. For example, Wedderburn v. I.N.S., 215 F.3d 795, 801 (7th Cir.2000), applied Miller, 523 U.S. 420, 118 S.Ct. 1428 (where, as noted above, majorities on every issue undermined the judgment), to reject a similar challenge to a different statute. In Wed-derbum, the Court reasoned not by legal analysis but by prediction about the votes of individual justices. 215 F.3d at 801. Finally, each judge on a multimember panel always has to vote ultimately on the outcome of a case; what is debatable is whether that vote should be based on the way majorities of judges resolve individual issues or how the individual judge views the preferred outcome. In some cases, like this one, where all agree on what the issues are, each relevant one is dispositive, *196 and they all arise in an agreed-on logical sequence, issue-voting strikes me as preferable. But I do not mean to promise that I will always vote by issue, and I do not mean to suggest that my colleagues should or must follow my lead. As we have seen, Supreme Court justices are inconsistent in their voting bases, and no source of law resolves the question of how to vote. And in some cases, especially capital ones, the practical implications of a judgment — life or death — may be more important than the choice of one voting protocol over another. See David Post & Steven C. Salop, Rowing Against the Tidewater: A Theory of Voting by Multijudge Panels, 80 Geo. L.J. 743, 761 (1992).

D. The Next Case: Toward a Voting Protocol Protocol

As we have seen, appellate judges have little to guide their discretion in choosing a voting protocol. This case prompts me to argue for one guidepost: when an appellant raises “arguments that would constitute independent appeals were interlocutory appeals permissible,” issue voting is preferable. Nash, supra, at 147-48.
Because in this case I view a coherent precedent from our Court as more valuable than a resolution in favor of the party I would have sided with were I deciding this case by myself, and because all agree the two issues presented here are easily separated, I concur with Judge Fuentes in a disposition that ultimately favors Hanover.
IV. Conclusion
Hanover should lack antitrust standing because it has not suffered antitrust injury within the meaning of the Supreme Court’s exposition of that term. However, I am outvoted on this issue, which sets the prec- • edent for our Court and the predicate for addressing the remaining issue (Noerr-Pennington). It has divided my colleagues, and thus my vote is needed to resolve it. I agree with Judge Fuentes that Noerr-Pennington poses no bar to relief at this stage in the litigation. Although I would affirm the District Court on antitrust standing grounds, I yield to my colleagues’ resolution of that issue and vote to vacate and remand on the lack of a Noerr-Pennington defense to Village.

. Our law that a plaintiff ought to be a consumer or competitor and that the "inextricably intertwined” injury presents a limited “exception” to this “requirement” is not the only way to read the relevant Supreme Court cases. The leading case on antitrust standing treated consumer-or-competitor status as one of several factors a court should weigh in considering whether a plaintiff has antitrust standing, Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), and in other circuits consumer-or-competitor status is less strongly emphasized. See, e.g., Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 311 (4th Cir.2007). However, it is the settled law of our Court.

. Blue Shield's argument was based in part on a now-outmoded theory that only the “target” of an antitrust violation could bring suit. Id. at 478 n. 14 & 479 n. 15; see also Associated Gen. Contractors, 459 U.S. at 536 n. 33, 103 S.Ct. 897 (rejecting "target area” theory).

. Union Gas is less squarely on point because no majority supported that judgment on every point. The issues were (1) whether two Congressional statutes were intended to abrogate state sovereign immunity and (2) whether Congress had that power under the Commerce Clause. 491 U.S. at 5, 109 S.Ct. 2273. Five justices held the statutes purported to annul state sovereign immunity and five that Congress had the power to do so. Id. at 13, 109 S.Ct. 2273. However, only four justices agreed on a rationale for Congress’s constitutional power. Justice White’s cryptic concurrence stated on the constitutional question only that "I agree with the conclusion reached by Justice Brennan in Part III of his opinion, that Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States, although I do not agree with much of his reasoning.” Union Gas Co., 491 U.S. at 57, 109 S.Ct. 2273 (White, J., concurring in the judgment in part and dissenting in part). It was this absence ’ of reasoning — not, as Judge Greenberg's dissent suggests, Justice White’s yielding to his colleagues on the statutory interpretation question — that caused the “confusion” noted in Seminole Tribe of Florida v. Florida, 517 U.S. 44, 64, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("Justice White, who provided the fifth vote for the result, wrote separately in order to indicate his disagreement with the plurality’s rationale.”).

. There may also be some support for issue voting in our decision in United States v. Bazzano, 712 F.2d 826 (3d Cir.1983) (en banc) (per curiam). In that case, nine of the ten judges would have voted to remand the case to the District Court. But no majority could agree on what the District Court should do on remand. Id. at 829 (noting that the "differing grounds on which these various votes for remand are rested cannot be reconciled so as to yield a majority vote for a remand with consistent instructions to the district court”). We thus affirmed the District Court’s judgment, despite nine of the ten judges agreeing on the outcome, because no majority could agree on rationale.

. This equation of precedent with an issue is problematic in a court that has power to overrule its precedent, like the en banc Third Circuit or the Supreme Court. Indeed, when a panel is in a position to overrule prior precedent, a voting paradox may be more likely. See David S. Cohen, The Precedent-Based Voting Paradox, 90 B.U. L.Rev. 183, 184 (2010). Luckily, that is not the case with a panel of this Court. See Third Circuit I.O.P. 9.1 ("It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a prec-edential opinion of a previous panel. Court en banc consideration is required to do so.”).

. This is not to say that judges should not dissent. In that sense, courts are not fully team enterprises.

. Judge Greenberg also relies on an article by then-Professor Rogers, who concluded that "over 150 Supreme Court cases involving plurality majority opinions indicate that a justice should not [aggregate votes by issue and therefore] defer to a majority that disagrees on a dispositive issue.” John M. Rogers, "I Vote This Way Because I’m Wrong”: The Supreme Court Justice as Epimenides, 79 Ky. L.J. 439, 459 (1990-91). But not one of that large number of cases actually purports to say how a judge "should” vote. Moreover, by Judge Rogers’ own count, only between fourteen and sixteen cases involved situations where the justices voted by outcome when an issue-vote would have yielded a different- result. Id. at 448 & n. 24. In light of the three cases where justices voted by issue and the Supreme Court's silence in all cases on whether issue-or outcome-based voting is preferable, I do not see how we can fairly understand the Court to have settled the question of the proper voting protocol. Kornhauser & Sager, supra, at 57 ("Current appellate practice with regard to paradoxical cases is in shambles. The Supreme Court, in particular, has been unmindful of the existence of the paradox, even when confronted with cases whose dispositions turn on the choice of alternative voting protocols.”).